

2007 Decisions

**Opinions of the United States Court of Appeals for the Third Circuit**

1-12-2007

# USA ex rel Atkinson v. PA Shipbuilding Co

Precedential or Non-Precedential: Precedential

Docket No. 04-3374

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA ex rel Atkinson v. PA Shipbuilding Co" (2007). *2007 Decisions.* Paper 1705.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1705

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 04-3374
_____

UNITED STATES OF AMERICA, ex rel.,
PAUL E. ATKINSON; EUGENE SCHORSCH

v.

PA. SHIPBUILDING CO.; FIRST FIDELITY BANK, N.A.;
SUN SHIP, INC.

Paul E. Atkinson,

Appellant.
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 94-cv-07316)
District Judge: Honorable William H. Yohn, Jr.
_____

Argued on November 15, 2005

Before: FUENTES, BECKER*, and ROTH**, <u>Circuit Judges</u>

(Opinion filed:  January 12, 2007 )

John G. Harkins, Jr., Esquire (Argued)
Eleanor M. Illoway, Esquire
David W. Engstrom, Esquire
Harkins Cunningham
2005 Market Street
2800 One Commerce Square
Philadelphia, PA  19103

        Counsel for Appellee Sun Ship Inc.

_____

       *This case was argued before the panel of Judges
Fuentes, Becker and Roth.  Judge Becker died on May 19,
2006, before the filing of the Opinion.  The decision is filed
by a quorum of the panel.  28 USC § 46(d)

       **Judge Roth assumed senior status on May 31, 2006.

Thomas H. Lee, II, Esquire (Argued)
Veronica B. Rice, Esq.
Dechert LLP
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA  19103

Joseph O. Click, Esquire
Blank Rome LLP
600 New Hampshire Avenue, N.W., Suite 1100
Washington, DC  20037

       Counsel for Appellee PA Shipbuilding Co.


Joseph G. DeRespino, Esquire (Argued)
Robert J. Dougher, Esquire
DeRespino & Dougher
1818 Market Street, Suite 2910
Philadelphia, PA  19103

       Counsel for Appellee Fidelity Bank

William N. France, Esquire (Argued)
Healy & Baillie LLP
61 Broadway
New York, NY  10006-2701

       Counsel for Appellant

---

OPINION

---

**ROTH**, <u>Circuit Judge</u>:

Paul Atkinson claims that certain companies conspired to and did defraud the United States Navy in connection with a contract to build oil tankers. Atkinson brought a *qui tam* action[1] under the False Claims Act ("FCA" or "the Act"), 31 U.S.C. §§ 3729-33,[2] alleging both false claims and "reverse" false claims.

---

[1]*Qui tam* actions have a long history and were used in England before the foundation of this country. "Qui tam" is short for the Latin phrase "qui tam pro domino rege quam pro se ipso in hac parte sequitur," which means "who pursues this action on our Lord the King's behalf as well as his own." <u>Vermont Agency of Natural Res. v. United States ex rel. Stevens</u>, 529 U.S. 765, 759, n.1, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000).

[2]31 U.S.C. §§ 3729(a)(2)-(4), and (7) impose liability on a person or entity who does any of the following:

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government;
>
> (3) conspires to defraud the Government by

4

Following submission of the Third Amended Complaint, the District Court dismissed all of the claims, relying on both jurisdictional and substantive deficiencies. While we will affirm the District Court, we do so for different reasons.

## I. Factual Background

Plaintiff/relator Paul Atkinson brought this action based on fraud allegedly perpetrated on the Navy by Sun Ship Inc., Pennsylvania Shipbuilding Co., and First Fidelity Bank, N.A. (Fidelity), in connection with the construction of Henry J. Kaiser class Oiler ships.[3] Detailing the alleged fraud requires

---

> getting a false orfraudulent claim allowed or paid;
>
> (4) has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person
> receives a certificate or receipt; [or]
> . . .

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government . . ..

[3]The original contract called for the construction of nine Oilers at cost of several hundred million dollars. The final

discussing both Penn Ship's corporate history and the events leading up to the Oiler contract. Although we decide this case on jurisdictional grounds, we will set forth the facts as Atkinson has alleged them.[4]

In 1980, Sun Ship decided to get out of the shipbuilding business. This enabled Sun Ship's parent company, Sun Co., to record a large loss reserve from which it was able to obtain a substantial tax benefit provided it did not go back into the shipbuilding business. However, Sun Ship had outstanding obligations which it could not discontinue without incurring large contractual liability. Accordingly, Sun Ship decided to continue to build ships via nominally independent companies. This enabled Sun Co. to obtain the tax benefit without breaching any of its contractual obligations.

In accordance with this plan, Sun Ship sold the Chester Shipyard in Chester, Pennsylvania, to three companies controlled by Edward E. Paden, Chairman of Levingston Shipbuilding Co. Atkinson alleges that Levingston was not

---

contract between the Navy and Penn Ship called for the construction of two Oilers, and the Navy subsequently exercised a contract option for Penn Ship to construct an additional two Oilers.

[4] United States ex rel. Dunleavy v. County of Del., 123 F.3d 734, 736 n.2 (3d Cir. 1997) (recognizing that where jurisdiction is at issue "the norm is not to accord the party whose burden it is to plead jurisdiction the presumption of truth as to facts pleaded that must be resolved in answering that question.")

financially sound at the time of sale and that Paden sought Sun Ship's help in obtaining Navy work for Levingston prior to the announcement of the deal. Sun Ship and Levingston allegedly agreed that Sun Ship would assist Levingston's pursuit of Navy contracts and that Levingston would take over Sun Ship's existing shipbuilding operations and perform Sun Ship's backlog of shipbuilding obligations. The sales agreement provided that three separate Paden companies would take title to the Chester Shipyard. Only one of those companies, Penn Ship, is a party to the current suit. The sales contract contained restrictive covenants that prevented Penn Ship from guarantying Levingston's obligations, making loans to Levingston, or investing in Levingston. The purpose of these restrictions, according to Atkinson, was to ensure Sun Company's tax write-off.

Two years later, Paden sold a controlling share of his ownership in Capital Marine Corporation (CMC), the corporate parent of Paden's companies including Levingston, to City Capital Corp., controlled by Thomas C. Weller, Jr., Leland Moore, and Ronald J. Stevens. The Navy solicited bids for oil tankers in 1984. According to Atkinson, Penn Ship and Sun Ship acted together in an effort to misrepresent Penn Ship's financial condition to enable it to obtain the Oiler contract. This was accomplished by the use of allegedly false financial statements that concealed the fact that Penn Ship, despite the restrictive covenants in the sales agreement between Sun Co. and Paden, was propping up Levingston financially. A possible Levingston bankruptcy could have impeded Penn Ship's ability to fulfill the Navy contract because Levingston held a lease on a floating drydock at the Chester Shipyard – an essential piece

7

of equipment for building the Oilers. If creditors foreclosed on the drydock, Penn Ship would be unable to continue construction.

On December 21, 1984, Penn Ship submitted a Best and Final Offer (BAFO) to build the ships. Of the five bids the Navy received, Penn Ship's was by far the lowest. In part, this was the result of Penn Ship's failure to include the cost of architectural and naval drawings necessary for completion of the project.

Although the Navy's solicitation offer was silent as to performance guarantees, after the Navy had accepted Penn Ship's bid, it asked Penn Ship to provide security against reprocurement costs in the event of default. This posed a problem for both the Navy and Penn Ship because requiring a performance bond would have necessitated a new solicitation of offers.[5] To avoid this, Thomas Weller, Chairman of Penn Ship, sent a letter to the Navy suggesting a Trust Indenture.[6] The Navy was to be the beneficiary of a trust, the assets of which were to be security interests in most of the Chester Shipyard property. Fidelity was to be appointed trustee.

The letter contained three statements that Atkinson

---

[5]Demanding a performance bond after a bid is accepted is a significant enough change in the solicitation to require rebidding.

[6]Because Penn Ship proposed the Trust Indenture, the Navy did not have to re-solicit bids.

alleges were false: first, that significant cost overruns were highly unlikely; second, that the Trust Indenture was irrevocable; and, third, that the Trust assets would consist of a security interest in the entire Penn Ship facility at Chester.

On March 26, 1985, the Navy accepted the Trust Indenture. Under its terms, Penn Ship was to record the security instruments comprising the *res* of the trust. Penn Ship failed to perform this obligation, and the interests were never recorded. Fidelity, the trustee, never sought to ensure that Penn Ship recorded the security interests, did not record them itself, and never informed the Navy of Penn Ship's failure to record. Penn Ship and the Navy entered into the Oiler contract on May 6, 1985. Despite the original solicitation offer, the final contract called for the construction of only two Oilers with an option, which the Navy later exercised, for two more.

Near the end of 1987, Penn Ship informed the Navy that it was having trouble paying subcontractors. In the spring of 1989, Penn Ship reported that it had reached a tentative agreement with Avondale Industries, Inc., to take over construction of the two additional Oilers ordered pursuant to the contract option. In June of 1989, the Navy signed Modification 05, which deleted the option Oilers from its contract with Penn Ship. The Navy renegotiated with Avondale for construction of the two option ships. In addition, Modification 05 changed Penn Ship's compensation structure from a cost reimbursement incentive price plan to a fixed price contract for $331,400,000. In January 1989, the Navy and Penn Ship agreed to Modification 11, which permitted the Navy to make advance payments to Penn Ship of up to seventeen million dollars and

9

provided that the drydock would act as security.[7]

After Modification 11 became effective, Penn Ship told the Navy that it was unable to perform the contract. In late August 1989, the Navy and Penn Ship signed Modification 17 (the Default Modification), which stipulated that Penn Ship was in default and provided that the contract would be transferred to another company for completion. The Trust Indenture was terminated and Penn Ship was released from liability under the contract, except for certain reprocurement costs and other liabilities. To secure these liabilities, the Navy obtained an additional two million dollar security interest in the floating drydock, a subordinated mortgage on some real estate that was mortgaged under the Trust Indenture, and a preferred mortgage on a floating derrick. The purpose of these interests was to encourage Penn Ship to use its best efforts to sell collateral so that some of those funds could be applied to Penn Ship's reprocurement obligations.

Atkinson claims that Penn Ship did not use its best efforts to sell the collateral and, in any event, Penn Ship was unsuccessful in doing so. After the period for the sale of collateral had expired, Penn Ship sold the derrick to Maritime Capital Corp (MCC), a corporation controlled by the Thomas Weller family of corporations. In its offer of sale to MCC, Penn Ship incorrectly asserted that title to the derrick was free and clear of encumbrances. This claim was false because of Penn Ship's obligations to the Navy. MCC then sold the derrick to

---

[7]The Navy advanced $10 million pursuant to Modification 11.

10

Donjon Marine Co., Inc., a good faith purchaser for value with no notice of the Navy's unrecorded security interest. This bill of sale also asserted that MCC owned the derrick free of encumbrances.

On January 13, 1992, Penn Ship and the Navy entered into Modification 20, which released Penn Ship from all of its contractual obligations under the Oiler contract. The two ships under the original contract were never finished and are now worth only their scrap value, approximately two million dollars.

## II. Procedural History

In 1992, Atkinson and then co-relator Eugene Schorsch brought their first *qui tam* action based on the circumstances described above. That action was amended once and then dismissed without prejudice.

Atkinson and Schorsch filed this, their second *qui tam* action, under seal on December 5, 1994. On June 5, 1997, co-relators filed an amended complaint adding Sun Ship as a defendant. The next day the government declined to intervene.[8]

Sun Ship and Fidelity filed separate motions to dismiss. On December 14, 1998, the District Court placed the action on the special management track, denied without prejudice the

---

[8]FCA procedure requires relators to allow the government to take over suits. 31 U.S.C. §§ 3730(a)-(b). If the government declines to intervene, the relator can proceed as the plaintiff on the government's behalf. Id.

motions to dismiss, and ordered the co-relators to file a second amended complaint. Only Atkinson was named as a relator in the Second Amended Complaint.[9] The defendants then moved to dismiss the Second Amended Complaint for failure to state a claim under FED. R. CIV. P. 12(b)(6) and for failure to plead fraud with particularity as required by FED. R. CIV. P. 9(b).

The District Court dismissed all of Atkinson's claims against Fidelity and Sun Ship and some of his claims against Penn Ship. Proceeding claim by claim, the District Court conducted a thorough analysis of all fourteen counts presented in the Second Amended Complaint. The District Court concluded that many of Atkinson's counts were insufficiently particular under Rule 9(b) or simply failed to state a claim under Rule 12(b)(6) because, for example, they omitted a required element of a cause of action. All of the dismissals were without prejudice to allow Atkinson to file yet another amended complaint. The District Court cautioned Atkinson that amendments beyond that were unlikely to be permitted.

Atkinson then filed the Third Amended Complaint which set forth twelve distinct counts and abandoned some counts asserted in the Second Amended Complaint. Only Penn Ship and Fidelity were named as defendants. They moved to dismiss under FED. R. CIV. P. 12(b)(1) for lack of subject matter jurisdiction and under FED. R. CIV. P. 12(b)(6) for failure to state a claim.

---

[9]Schorsch officially withdrew from the case by Stipulation and Order dated June 21, 1999.

The District Court turned its attention first to jurisdiction. As required by <u>Gould Electronics Inc. v. United States</u>, 220 F.3d 169, 176 (3d Cir. 2000), the District Court determined that it was dealing with a factual rather than facial challenge to jurisdiction because "it concerns not an alleged pleading deficiency, but rather the actual failure of relator's claims to comport with the jurisdictional prerequisites contained in 31 U.S.C. § 3730(e)(4)." <u>United States ex rel. Atkinson v. Pa. Shipbuilding</u>, 255 F. Supp. 2d 351, 362 (E.D. Pa. 2002). This conclusion permitted the District Court to "consider and weigh evidence outside the pleadings to determine if it [had] jurisdiction." <u>Id.</u> (quoting <u>Gould Elecs. Inc.</u>, 220 F.3d at 176).

The District Court then concluded that the pre-1986 version of the FCA's jurisdictional bar applied to the portion of Atkinson's complaint that was derived from events that occurred prior to the 1986 amendment to the FCA's jurisdictional provisions. <u>Id.</u> at 364-67 (citing <u>United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Prudential Ins. Co.</u>, 944 F.2d 1149, 1153-54 (3d Cir. 1991)).[10] The pre-1986 version of the FCA precluded federal jurisdiction when the relator's claims were based on allegations or transactions that had been publicly disclosed or were based on evidence possessed by the government at the time that the action was brought. Because the government had in its possession information regarding the pre-1986 claims at the time of the suit's inception, that portion of the complaint was disallowed. <u>Id.</u> at 366-67.

_____

[10]For a more detailed discussion of the history of the FCA's jurisdictional requirements see Part IV.B.1.

The District Court next turned to the defendants' primary jurisdictional argument under 31 U.S.C. § 3730, which, as we will discuss in more detail below, precludes the federal courts from exercising jurisdiction over a *qui tam* action when a complaint is based on material that is publicly disclosed under 31 U.S.C. § 3730(e)(4)(A) unless the relator is an "original source" of the information under 31 U.S.C. § 3730(e)(4)(B).[11] Proceeding claim by claim under the rubric set forth in Dunleavy, 123 F.3d at 740, and United States ex rel. Springfield Terminal Railway Co. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994), the District Court determined that all of Atkinson's claims were based upon allegations or transactions that were publicly disclosed and that Atkinson was an original source only of the non-recording of the security interests listed in the Trust Indenture. As to the claims that did not involve the non-recording, the District Court concluded that it lacked jurisdiction under 31 U.S.C. § 3730(e)(4)(A) because the information was publicly disclosed and Atkinson was not an original source of any of the components of the claims. For the remaining counts that were based in part on the non-recording as well as on another essential element that was publicly disclosed but for

---

[11]In conducting its inquiry pursuant to FED. R. CIV. P. 12(b)(1), the District Court declined to consider amendments to counts that it did not dismiss from the Second Amended Complaint because Atkinson was not given leave to amend the non-dismissed counts, nor did he obtain consent to do so from the adverse parties. FED. R. CIV. P. 15. Atkinson claims that the District Court's decision not to permit amendment was an abuse of discretion. We address and reject that argument in part IV.B.2.c.

14

which Atkinson was not an original source, the District Court held that jurisdiction was still lacking because, under the District Court's reading of our decision in United States ex rel. Mistick v. Housing Authority of the City of Pittsburgh, 186 F.3d 376 (3d Cir. 1999), a relator must be an original source of *all* essential elements of a claim to survive a jurisdictional challenge under section 3730.

The only claim to survive the District Court's jurisdictional analysis was the portion of the conspiracy claim based exclusively on information for which the court found Atkinson to be an original source – Penn Ship's failure to record and Fidelity's failure to ensure recordation of the security interests. As to that claim, the District Court partially granted the defendants' motion under Rule 12(b)(6) by dismissing the portion of the count alleging a reverse false claim because the District Court believed that 31 U.S.C. § 3729(a)(3) did not support that type of action.[12] Also, the District Court dismissed the portion of the first count that was based on any activity prior to December 4, 1988, because of the FCA's six-year statute of limitations. 31 U.S.C. § 3731(b)(1).

In a later opinion, the District Court granted summary judgment to Penn Ship and Fidelity on the sole remaining FCA

---

[12]31 U.S.C. § 3729(a)(3) provides liability for "[a]ny person who–conspires to defraud the Government by getting a false or fraudulent claim allowed or paid[.]" Reverse false claims are centered around an alleged fraudulent effort to reduce a liability owed to the government rather than to get a false or fraudulent claim allowed or paid.

15

conspiracy claim after determining that no reasonable jury could conclude that Penn Ship and Fidelity formed an agreement to defraud the government. The District Court first noted that recovery under 31 U.S.C. § 3729(a)(3) requires a plaintiff to show (1) a conspiracy to get a false or fraudulent claim allowed or paid and (2) an act in furtherance of the conspiracy. Following an exhaustive review of Atkinson's proffered evidence, the District Court concluded that the evidence fell short of establishing the required agreement. Atkinson filed a motion to reconsider which was denied on September 15, 2004. Atkinson then filed a timely notice of appeal.

## III. Jurisdiction and Standard of Review

This action was brought under the FCA, 31 U.S.C. §§ 3729-33 (1988). The District Court determined that it lacked subject matter jurisdiction under 31 U.S.C. § 3730(e)(4) over all but a portion of the first count of the Third Amended Complaint. The District Court then dismissed the remainder of Atkinson's action by way of summary judgment on July 28, 2004. We have jurisdiction over the District Court's final order under 28 U.S.C. § 1291.

We exercise plenary review of a District Court's dismissal for lack of subject matter jurisdiction under the FCA. Stinson, 944 F.2d at 1152. Because we will dismiss all of Atkinson's claims pursuant to the FCA's jurisdictional bar, we have no occasion to review the District Court's grant of summary judgment.

There is disagreement among the parties as to the nature

16

of the plaintiff's burden when faced with a Rule 12(b)(1) challenge to jurisdiction. Under Gould Electronics Inc., 220 F.3d at 178, we must start by determining whether we are dealing with a facial or factual attack to jurisdiction. If this is a facial attack, the court looks only at the allegations in the pleadings and does so in the light most favorable to the plaintiff. Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). If this is a factual attack, however, it is permissible for a court to review evidence outside the pleadings. Gould Elecs. Inc., 220 F.3d at 176 (citing Gotha v. United States, 115 F.3d 176, 178-79 (3d Cir. 1997); Mortensen, 549 F.3d at 891)). The District Court held that this was a factual challenge "as it concerns not an alleged pleading deficiency, but rather the actual failure of relator's claims to comport with the jurisdictional prerequisites contained in 31 U.S.C. § 3730(e)(4)." Atkinson, 255 F. Supp. 2d at 362. We agree.

In the interim between the defendants' partially successful challenge to Atkinson's Second Amended Complaint and the District Court's disposition of the defendants' motion to dismiss for want of jurisdiction in response to the Third Amended Complaint, the parties conducted extensive discovery on the jurisdictional issue. Moreover, the defendants' challenge, as accurately set forth by the District Court, goes to the actual facts supporting Atkinson's *qui tam* claim, not merely how those facts were pled. Therefore, the District Court was entitled to consider and weigh evidence outside the pleadings and properly placed the burden of establishing jurisdiction on Atkinson. Gould Elecs. Inc., 220 F.3d at 176-77 (citing Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)).

17

Having held that this is a factual challenge to jurisdiction, we now turn to Atkinson's claim that, because in his view the substantive and jurisdictional facts are intertwined, the District Court should have demanded less in terms of jurisdictional proof than otherwise customary. Atkinson is correct that, where jurisdictional and substantive facts are intertwined, we demand less by way of jurisdictional proof for a plaintiff to survive a Rule 12(b)(1) challenge. Gould Elecs. Inc., 220 F.3d at 178 (citing Mortensen, 549 F.2d at 891, 897-98). Defendants assert, however, that this is not a case of intertwined facts, and, therefore, the relaxed standard does not apply. Defendants have the better of the argument.

Atkinson's underlying burden to prove a substantive violation of the FCA is in no way intertwined with his burden to establish jurisdiction pursuant to 31 U.S.C. § 3730 and Rule 12(b)(1). The jurisdictional requirements of the FCA involve assessing whether the allegations and transactions constituting the bases of the claims were publicly disclosed and whether, if they were, the relator is an original source – meaning that he has direct and independent knowledge of the information. 31 U.S.C. §§ 3730(e)(4)(A)-(B). If a relator gets over these hurdles, he must then make his substantive case. This requires establishing that the defendant submitted false claims. 31 U.S.C. §§ 3729(a)(2)-(4), (7). To meet this burden, a plaintiff must put forth proof wholly distinct from that necessary to survive a jurisdictional challenge under §§ 3730(e)(4)(A)-(B).[13] Thus, we

[13]Atkinson cites Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 951, 117 S. Ct. 1871, 138 L. Ed. 2d 135 (1997), for the proposition that the jurisdictional requirements

18

hold that the District Court applied the proper standard in reviewing the defendants' Rule 12(b)(1) challenge, and we will apply the same standard in conducting our plenary review of the jurisdictional issues.

## IV.  Discussion

### A.  Waiver of Claims for Failure to Reassert in Subsequent Pleading

Before turning to the District Court's jurisdictional rulings, we must address Sun Ship's contention that Atkinson waived his right to appeal the District Court's dismissal of Sun Ship from the Second Amended Complaint by failing to replead claims against Sun Ship in his Third Amended Complaint.  We agree with Sun Ship and hold that Atkinson has waived his right to assert error in connection with the dismissal of his claims

---

of the FCA affect the "substantive rights of the parties . . .." This, apparently, is designed to encourage us to hold that jurisdictional and substantive facts are always intertwined under the FCA.  Hughes Aircraft Co. requires no such result.  In Hughes Aircraft Co., the Court was faced with whether the FCA's jurisdictional restrictions applied retroactively.  Id. Hughes Aircraft Co. had nothing to do with how a plaintiff must go about establishing jurisdiction under the FCA.  The Court's holding in that case in no way impacts the requirement that the facts necessary to establish both jurisdiction and a right to substantive relief must be intertwined before any relaxed burden of proof applies to plaintiffs dealing with factual challenges to jurisdiction under Rule 12(b)(1).

against Sun Ship.

In addition to naming Fidelity and Penn Ship, the Second Amended Complaint also included claims against Sun Ship. As discussed above, the District Court dismissed, without prejudice, all of the claims pertaining to Sun Ship under Rules 9 and 12(b)(6). The District Court specifically granted Atkinson leave to amend his complaint but warned him that further amendments would probably not be permitted. When Atkinson filed his Third Amended Complaint, he once again named Penn Ship and Fidelity, but Sun Ship was no longer included as a party. Indeed, when the District Court disposed of the remaining defendants' motions to dismiss the Third Amended Complaint, it remarked that "Sun Ship has been dropped as a defendant."[14] Atkinson, 255 F. Supp. 3d at 361. On appeal, Atkinson now challenges the District Court's decision to grant Sun Ship's motion to dismiss even though the dismissal was without prejudice, Atkinson did not include Sun Ship in the Third Amended Complaint, and Atkinson did not otherwise indicate

---

[14]It appears that the decision to omit Sun Ship from the Third Amended Complaint was a strategic choice by Atkinson's then counsel Storch, Amini & Munves, P.C ("Storch"). At the hearing before the District Court over Storch's motion to withdraw as counsel, Atkinson said that he "strongly protested the refusal of the Storch firm to rename Sun Ship as a [defendant] in the [Third Amended Complaint], . . . but . . . reluctantly agreed to allow [it]" believing that Storch would rename Sun Ship after discovery produced more evidence implicating it in the alleged FCA violations. Letter to Judge Yohn (Sept. 8, 2004).

20

an intention to stand on his dismissed pleading as to Sun Ship. We conclude that where, as here, it would not have been futile to replead dismissed claims but those claims are nevertheless omitted from an amended pleading, the right to challenge the basis for dismissal on appeal is waived.[15]

This Court has yet to articulate a rule concerning whether the failure to include a dismissed claim in an amended pleading constitutes a waiver of the right to challenge on appeal the basis for the dismissal. We believe the proper rule allows plaintiffs to appeal dismissals despite amended pleadings that omit the dismissed claim *provided* repleading the particular cause of action would have been futile.[16] As far as our research suggests,

---

[15]Requiring a plaintiff to replead where repleading would be futile "merely sets a trap for unsuspecting plaintiffs with no concomitant benefit to the opposing party." Davis v. TXO Prod. Corp., 929 F.2d 1515, 1518 (10th Cir. 1991) (citation omitted).

[16]The Ninth Circuit, which we decline to follow, has articulated the most formalistic approach in these circumstances. E.g., Marx v. Loral Corp., 87 F.3d 1049, 1055-56 (9th Cir. 1996). Holding fast to the general rule that "an amended complaint ordinarily supersedes the original and renders it of no legal effect," International Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977), the Ninth Circuit has held that "all causes of action alleged in an original complaint which are not alleged in an amended complaint are waived." King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987).

The Tenth and Fifth Circuits take a more flexible

no appellate court has yet faced the amended complaint waiver rule where, as here, the amended complaint leaves out a *defendant* rather than merely a cause of action. When a plaintiff's amended complaint leaves out a *party* previously named in the preceding complaint, the equitable principles we enunciate here apply even more strongly because parties that do not appear in amended complaints have a legitimate expectation that they are no longer involved in the litigation.

Repleading is futile when the dismissal was "on the merits." A dismissal is on the merits when it is with prejudice or based on some legal barrier other than want of specificity or particularity. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1435 (3d Cir. 1997) (finding futility, in the context of discussing leave to amend, where claims would not survive a Rule 12(b)(6) motion "even if pled with more particularity."). For example, dismissals based on subject matter jurisdiction or preemption should be understood as being on the merits. See Joyce v. RJR Nabisco Holdings Corp., 126 F.3d 166, 173-74 (3d Cir. 1997) (declining to find waiver where plaintiff did not file an amended complaint following a district court's preemption based rejection). Repleading is futile in such cases because the

---

approach. "[W]hile the pleader who amends or pleads over, waives his objections to the ruling of the court on indefiniteness, incompleteness or insufficiency, . . . he does not waive his exception to the ruling which strikes 'a vital blow to a substantial part' of his cause of action." Davis, 929 F.2d at 1517 (quoting Blazer v. Black, 196 F.2d 139, 143–44 (10th Cir. 1952) (citation omitted); Wilson v. First Houston Inv. Corp., 566 F.2d 1235, 1237-38 (5th Cir. 1978)).

legal inadequacy cannot be solved by providing a better factual account of the alleged claim.[17] To the extent that there is uncertainty as to whether a dismissal is on the merits, doubts should be resolved *against* the party asserting waiver.

If a party omits a claim from an amended complaint that it would not have been futile to replead, that party can still preserve the claim for appellate review by standing on the dismissed claim despite leaving it out of the amended complaint.[18] We do not adopt a rigid requirement as to what a

---

[17]Sometimes deciding whether dismissal is on the merits will require reading the district court's dismissal order in light of the plaintiff's alleged litigating position. For example, in <u>Bastian v. Petren Resources Corp.</u>, 892 F.2d 680, 682-83 (7th Cir. 1990), the plaintiff's original complaint charged violations of Rule 10b-5 and 18 U.S.C. §§ 1961 <u>et. seq.</u> (the RICO statute). The RICO claim was dismissed with leave to amend because of a technical pleading deficiency. The 10b-5 claim, however, had what the district court believed to be a more serious problem: failure to allege loss-causation. Plaintiff, however, contended that an allegation of loss-causation was not necessary. <u>Id.</u> at 683. Although the district court dismissed that claim with leave to amend (that is, to include facts supporting loss-causation), we considered the dismissal to have been on the merits for waiver purposes because the pleading "error" went to the legal requirements of a 10b-5 action.

[18]The practice of standing on a dismissed complaint for purposes of invoking appellate review is by no means foreign to this Court. "[A] dismissal without prejudice is not a final

23

plaintiff must do to stand on a dismissed complaint. Adding a section to an amended pleading specifically preserving the claim certainly suffices. Smith v. Nat'l Health Care Serv. of Peoria, 934 F.2d 95, 98 (7th Cir. 1991) (involving case where plaintiff added a "Preserved Claims" section to his amended pleading). It would also be acceptable for a plaintiff to file a notice with the district court stipulating that he has decided to stand on his previous pleading with respect to a claim or party now dropped from the otherwise operative pleading.

In this case, it is clear from the District Court's opinion that it would *not* have been futile to replead the claims against Sun Ship because the dismissals were based on pleading deficiencies rather than substantive disagreements regarding the legal requirements of the causes of action. The District Court specifically invited Atkinson to file an amended complaint. The District Court dismissed count one of Atkinson's Second Amended Complaint because Atkinson failed to plead facts necessary to sustain relief: "[B]ecause the complaint lacks any allegations supporting an agreement to commit a fraudulent act entered into by Sun Ship and any other defendant, . . . the court will dismiss the claim for conspiracy against Sun Ship under the FCA without prejudice." United States ex rel. Atkinson v. Pa. Shipbuilding Co., No. CIV.A.94-7316, 2000 WL 1207162, at *11 (E.D. Pa. Aug. 24, 2000). Likewise, the District Court

appealable order under § 1291, unless the plaintiff can no longer amend the complaint or unless the plaintiff declares an intention to stand on the complaint as dismissed." Semerenko v. Cendant Corp., 223 F.3d 165, 172 (3d Cir. 2000) (citations omitted); Borelli v. City of Reading, 532 F.2d 950 (3d Cir. 1976).

24

dismissed counts two through four based on similar pleading deficiencies. See, e.g., Atkinson, 2000 WL 1207162, at *14-16 ("Nowhere in the complaint is it alleged, much less with the particularity required by Rule 9(b), how the actions of Sun Ship caused Penn Ship to make misrepresentations to the Navy.").

Atkinson's Third Amended Complaint did not name Sun Ship as a defendant. Moreover, Atkinson never informed the District Court or Sun Ship that he was standing on his allegations in the Second Amended Complaint vis-à-vis Sun Ship rather than simply dropping Sun Ship from the suit. Atkinson filed his notice of appeal from the District Court's final order granting Fidelity and Penn Ship summary judgment on August 17, 2004 – almost four years after Atkinson had filed his Third Amended Complaint that failed to include Sun Ship as a defendant. It would be unjust under these circumstances to enable Atkinson to drag Sun Ship back into this case after Sun Ship, by Atkinson's own decision, was dropped as a defendant. Accordingly, we hold that Atkinson has waived his right to challenge the District Court's grant of Sun Ship's motion to dismiss.

## B. The FCA's Jurisdictional Bar

The District Court dismissed a portion of count one, and all of the remaining counts, based on the FCA's jurisdictional bar. 31 U.S.C. § 3730. In reaching its conclusion, the District Court found that Atkinson's claim was based upon allegations or transactions that were publicly disclosed but that Atkinson was an "original source" only of Penn Ship's non-recording of the security interests and Fidelity's failure to ensure recordation

25

under 31 U.S.C. § 3730(e)(4)(B). For the District Court, Atkinson's original source status as to this fact did not preserve those claims that relied on either element for which Atkinson was an original source because, under our decision in <u>Mistick</u>, 186 F.3d 376 (3d Cir. 1999), the District Court believed that Atkinson was required to be an original source of *all* essential elements of each claim.

Because we hold that Atkinson was not an original source of the non-recording, we need not address whether <u>Mistick</u> requires a relator to be an original source of all essential elements of his claim. Likewise, our holding renders it unnecessary for us to address Atkinson's other alleged claims of error in the District Court.[19]

### 1. The FCA's Jurisdictional Provisions

This Court has previously detailed the history of the FCA and, in particular, the jurisdictional provisions of 31 U.S.C. § 3730. <u>Dunleavy</u>, 123 F.3d at 738; <u>Stinson</u>, 944 F.2d at 1152-54. Under certain circumstances, the *qui tam* provisions allow private relators to sue, on behalf of the United States, any person or entity that submits a false claim to the Government. <u>Hughes Aircraft Co.</u>, 250 U.S. at 941, 117 S. Ct. 1871, 138 L. Ed. 2d 135. Before it was amended in 1986, the FCA contained very restrictive provisions barring *qui tam* suits if the information on

---

[19]To the extent that the District Court's discovery orders affected Atkinson's ability to formulate his claims, we find that the District Court did not abuse its discretion in disposing of Atkinson's many discovery related motions.

which they were based was already in the Government's possession. Mistick, 186 F.3d at 382 (citing Hughes Aircraft Co., 250 U.S. at 941). In an effort to ease the restrictions and "revitalize" *qui tam* actions,[20] Congress enacted 31 U.S.C. § 3730(e)(4)(A), which provides:

[20]Congress sought a middle-ground between a restrictive approach that essentially eliminated the FCA's relator provisions and a free-for-all of parasitic suits based on publicly available information. In 1943, the Supreme Court had held that a relator could bring a *qui tam* action based solely on information derived from a government criminal indictment. United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S. Ct. 379, 87 L. Ed. 443 (1943). In response, Congress amended the FCA to prohibit relator suits "based on evidence or information the government had when the action was brought." 31 U.S.C. § 3730(b)(4) (1982) (superseded). The federal courts read this restriction broadly, going so far as to prohibit the state of Wisconsin from bringing a *qui tam* suit based on evidence of Medicaid fraud when the state was required to report the information to the Department of Health and Human Services. United States ex rel. Wisconsin v. Dean, 729 F.2d 1100, 1106 (7th Cir. 1984). The 1986 amendments were passed as a response to decisions like Dean which drastically narrowed the availability of suits by private relators. Stinson, 944 F.2d at 1153-54 (detailing the history of the FCA). As a result, the 1986 Amendments "must be analyzed in the context of [the] twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." Springfield Terminal, 14 F.3d at 651.

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office [sic] report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

Under 31 U.S.C. § 3730(e)(4)(B) an "original source" is:

an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

## 2. Public Disclosure and Original Source Analysis

To determine whether a plaintiff is barred by the FCA's public disclosure provisions, we must first assess whether the relator's claim is based on publicly disclosed allegations or transactions. This, in turn, requires a twofold analysis. First, we determine whether the information was disclosed via one of the sources listed in § 3730(e)(4)(A). Second, we decide whether the relator's complaint is based on those disclosures. To be "based upon" the publicly revealed allegations or transactions the complaint need only be "supported by" or "substantially similar to" the disclosed allegations and transactions. Mistick, 186 F.3d at 385-88 (rejecting a rule that "based upon" means

28

"actually derived from," because such a rule would render the original source exception superfluous).

To aid our analysis we are guided by an algebraic representation of the nature and extent of disclosure required to raise the jurisdictional bar. Dunleavy, 123 F.3d at 741 (quoting Springfield Terminal, 14 F.3d at 654).

[I]f $X + Y = Z$, $Z$ represents the allegation of fraud and $X$ and $Y$ represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of $X$ and $Y$ must be revealed, from which readers or listeners may infer $Z$, i.e., the conclusion that fraud has been committed.

Id. To draw an inference of fraud, both a misrepresented [$X$] and a true [$Y$] state of facts must be publicly disclosed. Id. at 741. So, if either $Z$ (fraud) or both $X$ (misrepresented facts) and $Y$ (true facts) are disclosed by way of a listed source, then a relator is barred from bringing suit under § 3730(e)(4)(A) unless he is an original source.

To be an original source, a relator's knowledge must be both direct and independent. "Independent knowledge" is knowledge that does not depend on public disclosures. Stinson, 944 F.2d at 1160. "Direct knowledge" is knowledge obtained without any "intervening agency, instrumentality or influence: immediate." Id. (quoting Webster's Third New International Dictionary 640 (1976)). The FCA "seeks to encourage persons with 'first hand knowledge of fraudulent misconduct,' or those 'who are either close observers or otherwise involved in the fraudulent activity' to come forward." United States ex rel.

29

Barth v. Ridgedale Elec., Inc., 44 F.3d 699, 703 (8th Cir. 1995) (internal citations omitted) (quoting S. Rep. No. 345 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5269)).

In making our determination whether a relator is an "original source," we have yet to describe the proper analysis when a relator's claims are based in part upon public disclosures covered by § 3730(e)(4)(A), but the relator also asserts original source status on the basis of a review of public information that does *not* qualify under that section.[21]

We will apply these principles to each of Atkinson's claims to determine whether they are barred by §§ 3730(e)(4)(A)-(B). In the process, we take this opportunity to discuss the scope of the original source exception in cases in which the plaintiff asserts that status based upon learning an essential element from publicly available information that falls outside the scope of § 3730(e)(4)(A).

---

[21]A determination that a public disclosure does not qualify under § 3730(e)(4)(A), as in Dunleavy, does not always end the inquiry. Where, as here, there is an independent basis upon which a court finds that an element of a *qui tam* relator's claim was publicly disclosed, the question becomes whether the relator is an original source of that element under § 3730(e)(4)(B). Simply because a state record cannot serve as a source of publicly disclosed allegations and transactions for purposes of § 3730(e)(4)(A), Dunleavy, 123 F.3d at 744-45, does not mean that the public nature of the state record is irrelevant under the direct and independent knowledge language of § 3730(e)(4)(B).

### a. Count One:  Alleged Conspiracy Between Penn Ship and Fidelity in Violation of 31 U.S.C. §3729(a)(3)

The first count of Atkinson's Third Amended Complaint alleges a conspiracy between Penn Ship and Fidelity to cause "false and fraudulent claims and reverse false claims [to be] allowed or paid in violation of 31 U.S.C. § 3729(a)(3)." According to Atkinson, Penn Ship's alleged participation was its intentional failure to record the security instruments identified in the Trust Indenture.  Fidelity's alleged role in the conspiracy was threefold:  (1) the attempt to convince the Navy to accept a version of the Trust Indenture that excluded a provision for delivery of all recording documents by Fidelity to the Navy, (2) the failure to secure recordation, and (3) the failure to sign forms necessary to perfect the Navy's security interest.[22]

---

[22]Atkinson now asserts that Fidelity's alleged role in the conspiracy contained a fourth element – Fidelity's failure to inform the Navy that the security interests were not perfected.  Contrary to Atkinson's assertions, the District Court was correct to consider only the three aspects of the claim described above because Atkinson's own Memorandum in opposition to defendants' motions to dismiss did not challenge the defendants on the ground that there was this fourth aspect to the claim.

Atkinson conceded that the elements of the fraud theory concerning Fidelity's alleged role were publicly disclosed. However, he claims that Penn Ship's failure to record was not. The District Court held, and we agree, that the non-recording claim was based on public disclosures. Both the Navy's response to then co-relator Schorsch's FOIA request and a Department of Defense Office of the Inspector General Audit Report of March 25, 1994, (DoD IG Report) constitute public disclosures within the meaning of § 3730(e)(4)(A) and reveal the non-recordation. Mistick, 186 F.3d at 383 (holding that a response to a FOIA request falls within the scope of § 3730(e)(4)(A)'s "administrative . . . report" provision).

Atkinson argues that his first allegation of the non-recording of the security interests was in his original *qui tam* action which predated the FOIA request and the DoD IG Report. Therefore, his subsequent *qui tam* action cannot be "based upon" the transactions revealed in those documents. Had Atkinson pursued his original FCA suit, he would have a strong argument that his claim is not "based upon" the transactions later revealed in response to the FOIA request and DoD IG Report. Atkinson's previous assertion of a FCA claim does not, however, insulate his subsequent action from normal public disclosure analysis when the allegations in the later action are "substantially similar to" the information revealed in the FOIA request and the DoD IG Report. We cannot articulate it any better than the District Court:

Wholly beside the point, under the straightforward Mistick analysis, is a relator's own previous assertion of the relevant allegation or transaction in a prior action or his previous

32

discovery of such via non-public means. While these considerations might have precluded the application of the public disclosure bar in the predecessor action, and although they certainly impact the original source analysis, . . . they do not alter the fact that the information was disclosed via a statutorily-enumerated means prior to its assertion in this action by relator.

Atkinson, 255 F. Supp. 2d at 373; United States ex rel. Laird v. Lockheed Martin Eng. & Sci. Serv. Co., 336 F.3d 346, 352 n.2 (5th Cir. 2003) (reaching same conclusion) (quoting United States ex rel. Jones v. Horizon Healthcare Corp., 160 F.3d 326, 330 (6th Cir. 1998)).

Having determined that count one is based upon the publicly disclosed FOIA request and DoD IG Report, we must next decide whether Atkinson is an original source. The District Court held that Atkinson is an original source after concluding that Schorsch obtained direct and independent evidence of the non-recording by examining county records. Leaving aside the issue of whether Schorsch's knowledge can be imputed to Atkinson under the FCA, we hold that Schorsch, and therefore Atkinson, is not an original source of the failure to record.

As discussed above, an original source must have "direct and independent knowledge of the information on which the allegations are based . . .." 31 U.S.C. § 3730(e)(4)(B). If a relator's knowledge is based solely upon public disclosures within the meaning of § 3730(e)(4)(A), then the relator does not have direct and independent knowledge under § 3730(e)(4)(B). Stinson, 944 F.2d at 1160 (citing Houck ex rel. United States v.

33

Folding Admin. Comm., 881 F.2d 494, 505 (7th Cir. 1989)). We have yet to specifically address for purposes of the original source analysis, however, the impact of a relator's reliance upon information in the public domain that is not a § 3730(e)(4)(A) public disclosure.

In addressing this issue, we are mindful of the Springfield Terminal approach utilized to determine whether an FCA claim is "based upon" public disclosures. Once we determine that an X or Y element is based upon public disclosures under § 3730(e)(4)(A), we focus on whether the relator is an original source of the information underlying that element. If the relator's knowledge of the element is based solely on a § 3730(e)(4)(A) public disclosure, the relator is not an original source. Stinson, 944 F.2d at 1160. Where, as here, the relator's knowledge of the element is based, in whole or part, on information available in the public domain that is not a § 3730(e)(4)(A) public disclosure, it is the nature and extent of reliance upon that information that determines whether the relator is an original source.

The Tenth Circuit Court of Appeals' approach to resolving original source status is informative. In Kennard v. Comstock Resources, Inc., 363 F.3d 1039 (10th Cir. 2004), relators brought suit under the FCA against oil and gas well operators for alleged underpayment of royalties to Indian tribes. After concluding that there was a prior public disclosure, the court determined that relators were an original source. Id. The defense argued that relators were not an original source, in part because they relied upon public records in reaching their conclusion that the defendants defrauded the government. Id.

34

The court refused to adopt a bright-line rule always disqualifying relators as an original source when part of the basis of their information is consultation of public records. <u>Id.</u> at 1045. Instead, the court articulated a case-by-case approach:

[T]he degree and character of such reliance is necessarily deserving of our attention. A mere compilation of documents already in the public domain will not allow a relator to qualify as an original source. However, a complete and thorough investigation of a fraud on the Government will likely necessarily involve some review of contracts, documents, or other information in the public domain. *It is the character of the relator's discovery and investigation that controls this inquiry.*

<u>Id.</u> (emphasis added).

We conclude that the extent of reliance on information already in the public domain should be a consideration during the original source inquiry, even if that information is not a public disclosure within the meaning of § 3730(e)(4)(A). While it is true that reliance solely on "public disclosures" under § 3730(e)(4)(A) is *always* insufficient under § 3730(e)(4)(B) to confer original source status, reliance on public information that does not qualify as a public disclosure under § 3730(e)(4)(A) may also preclude original source status depending on the extent of that reliance and the nature of the information in the public domain. <u>See</u> <u>Barth</u>, 44 F.3d at 703-04 (holding that a relator did not have direct knowledge of an alleged fraud when the knowledge was obtained in part by review of publicly-filed payroll records) . Thus, in deciding whether a relator's reliance on public records bars him from being an original source under

35

§ 3730(e)(4)(B), courts should consider both "the availability of the information and the amount of labor and deduction required to construct the claim." Kennard, 363 F.3d at 1046. The more obscure the records and the more significant the investigative input of the relator, the more likely it is that granting original source status will fulfill the FCA's "twin goals of rejecting suits which the government is capable or pursuing itself, while promoting those which the government is not equipped to bring on its own." Springfield Terminal, 14 F.3d at 651.

We decline to adopt a rigid rule that consultation with public documents automatically disqualifies a relator from being an original source. Some reliance on public records or information is acceptable and, indeed, it is hard to imagine that a non-insider could ever obtain original source status without at least some consultation of publicly available information.[23] United States ex rel. Grynberg v. Praxair, Inc., 389 F.3d 1038, 1053 (10th Cir. 2004). That said, courts must be mindful of suits based only on "secondhand information, speculation, background information or collateral research . . .." United States ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1162-63 (10th Cir. 1999).

---

[23]Although the FCA was most concerned with encouraging whistle-blowing by insiders with first-hand knowledge, neither the text of the FCA nor its legislative history suggests that non-insiders should never be able to bring *qui tam* actions. The public disclosure and original source provisions provide sufficient protection against inappropriate suits by relators without sufficient direct and independent knowledge.

36

Applying these principles here, we hold that, under § 3730(e)(4)(B), Atkinson is not an original source of the non-recording because his knowledge of the non-recording is not direct and independent within the meaning of that section. Any member of the public could have gone to a county recording office to see if Penn Ship or Fidelity had recorded the interests as required by the Trust Indenture. Unlike in Kennard, Atkinson's research did not involve "obscure" public records, nor were the public records only a small part of the information ultimately uncovered by his investigation. Indeed, it was *only* from review of information in the public domain that Atkinson learned of the failure to record. Looking at the two prongs of the Kennard test, the availability of the information was high and the amount of deduction was minimal. It takes little sophistication to conduct a survey of public recordings to determine the absence of a filing; anyone interested in knowing whether Penn Ship recorded the instruments listed in the Trust Indenture could do so. Moreover, extrapolating from the absence of a recording to the fact that the instruments were not recorded does not require much interpretive rigor.

Holding that reliance on state public records can preclude original source status under § 3730(e)(4)(B) does not run afoul of our decision in Dunleavy that non-federal administrative reports are not public disclosures for purposes of § 3730(e)(4)(A). Dunleavy holds that, even if there had there been no other source of public disclosure, it would be improper to raise the § 3730(e)(4)(A) jurisdictional bar based only upon the county public records. Once there is an independent basis for raising the public disclosure bar, however, the public nature of the information upon which a relator bases his claim, even if

37

not a "public disclosure" under § 3730(e)(4)(A), is relevant in determining whether that knowledge is direct and independent under § 3730(e)(4)(B). Dunleavy simply had nothing to say about the role of reliance upon information in the public domain for purposes of the original source analysis.

Having concluded that Atkinson's first count is based on publicly disclosed information both under § 3730(e)(4)(A) and from other public records and that Atkinson is not an original source of any of that information under § 3730(e)(4)(B), we hold that the District Court lacked subject matter jurisdiction over count one of his FCA claim. Thus, while the District Court was correct to the extent it rejected the bulk of count one on jurisdictional grounds, it was incorrect in failing to dismiss the entire count for that reason.

### b. Counts Two and Three: Intentional Disclosure of False Financial Statements

Counts two and three relate to Penn Ship's September 30, 1984, and December 31, 1984, financial statements. Atkinson admitted that "the terms of the financial statement[s], and the bas[e]s for concluding [their] intentional falsity, are based on public disclosures of which Atkinson is not the original source." Atkinson, 255 F. Supp. 2d at 382 (quoting Relator's Memo. At 44-45). Thus, these counts are barred by the FCA's jurisdictional restrictions in §§ 3730(e)(4)(A)-(B).

### c. Count Four: Alleged Violation of § 3729(a)(2) Based on Penn Ship's BAFO

38

Atkinson attempted to amend count four following the District Court's partial dismissal of his Complaint under Rules 12(b)(6) and 9(b). Atkinson, 2000 WL 1207162, at *23. The District Court, however, did not grant Atkinson leave to amend count four, and he never sought leave to do so. Therefore, the District Court reviewed the claim under FED. R. CIV. P. 12(b)(1) as it was set forth in the Second Amended Complaint. 255 F. Supp. 2d at 383.

Atkinson now claims that it was an abuse of discretion for the District Court to reject the Third Amended Complaint insofar as it altered claims that the District Court did not dismiss because Atkinson was led to believe that he would be permitted to amend again after his claims were tested under Rule 12(b)(1). This argument is unpersuasive. Even assuming that the District Court's orders were confusing with respect to how it would dispose of defendants' claims under Rules 12(b)(6) and 12(b)(1), if Atkinson wished to alter his non-dismissed claims, he still needed to move for leave to amend them. FED. R. CIV. P. 15(a) (providing that a party may amend a pleading once prior to the filing of a responsive pleading but otherwise must obtain leave of the court or consent of the adverse party). The rejection of an unapproved amended complaint is not an abuse of discretion. Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1280 (D.C. Cir. 1994).

However, Atkinson's real source of consternation appears to be a substantive one. He believes that the District Court improperly applied Mistick in ruling on the jurisdictional challenges. This disagreement does not cause us pause because, in our view, the proper scope of Mistick is not before us. In any

event, having failed to seek leave to amend, Atkinson cannot turn his substantive disagreement over the scope of Mistick into an abuse of discretion on the part of the District Court.

We now turn to count four as pled in the Second Amended Complaint. Atkinson claims that, when Penn Ship submitted its BAFO, it knew that it would be unable to complete the Oiler contract for the price in the offer. As the District Court found, count four contains two main elements. First, Penn Ship's BAFO was the lowest bid and set a price of $848,105,300 for nine Oilers. Second, Penn Ship knew at the time it submitted its offer that its price was too low.

Thus, the question is whether the allegations and transactions underlying these essential elements were publicly disclosed under § 3730(e)(4)(A). We conclude that they were. A July 30, 1989, article in the Philadelphia Inquirer explicitly referred to Penn Ship's "low bid" as a factor leading to Penn Ship's failure to complete the contract. Also, the March 25, 1994, DoD IG Report stated that, "[t]he Penn Ship target costs and price proposals were unreasonably low compared with the other proposals." The DoD IG Report also disclosed the amount of the offer in the BAFO.

Because these are public disclosures within the meaning of § 3730(e)(4)(A) and Atkinson's knowledge of the alleged fraud is derived therefrom, Atkinson cannot be an original source under § 3730(e)(4)(B). Therefore, the District Court correctly held that it was without jurisdiction to hear this count

of the Complaint.[24]

### d. Count Five:  Alleged Violation of § 3729(a)(2) Based on the "Weller" Letter

Atkinson alleges that the March 15, 1985, letter from Penn Ship to the Navy suggesting a Trust Indenture as a way to allay the Navy's fears concerning non-performance contained intentional misrepresentations designed to induce the Navy into entering into the Oiler contract with Penn Ship.  The three alleged intentional falsehoods were (1) that significant cost overruns were highly unlikely even though Penn Ship knowingly understated its costs of completion, (2) that the Trust Indenture was irrevocable even though the agreement allowed Penn Ship to take the assets out of the trust,[25] and (3) that the

---

[24]Atkinson appears to argue that this count is not susceptible to a jurisdictional challenge because when he filed his first *qui tam* action the information was not publicly disclosed.  We first note that this is factually inaccurate because Atkinson's first action began in 1993, some years after the article in the Philadelphia Inquirer discussed Penn Ship's low bid.  Even assuming, however, that Atkinson is correct that public disclosure of the allegations or transactions did not occur until after he filed his initial *qui tam* suit, it does not protect him.  As discussed above, public disclosures occurring after a FCA case is dismissed, but before a subsequent action, can still raise the jurisdictional restriction of § 3730(e)(4)(A).

[25]Atkinson alleges that in the event of Penn Ship's default the Trust Indenture contained a roughly two-week "window" in

trust *res* would consist of a security interest or mortgage in the entire Penn Ship facility even though seven critical acres of office space were deliberately excluded.[26]

Using the formula from Springfield Terminal, we can set up the following elements of the alleged fraud. With respect to the first alleged falsity: X–letter states that cost overruns are unlikely; Y–cost overruns were anticipated by Penn Ship. With respect to the second alleged falsity: X–letter states that the trust is irrevocable; Y–trust could be defeated by selling trust assets. Finally, with respect to the third alleged intentional misrepresentation: X–letter states that the trust *res* is composed of the entire Chester yard; Y–trust *res* excluded seven critical acres.

Defendants argue that the X element of all three alleged misrepresentations was publicly disclosed when the Senate Chief Investigator provided Schorsch with the Weller letter. We agree. Documents disclosed to the public during or following a federal government investigation are quintessential "public disclosures" under § 3730(e)(4)(A) ("No court shall have jurisdiction over an action . . . based upon the public disclosure of allegations or transactions . . . in a congressional . . . report,

---

which Penn Ship was allowed to sell the assets constituting the *res* of the trust, thereby defeating the Navy's security interest. Of course, the Navy signed the contract after a full review of its terms and agreed to the window provision.

[26]The metes and bounds of the covered property were set forth in the Trust Indenture itself.

42

hearing, audit, or *investigation . . ..*) (emphasis added).

With respect to the alleged misrepresentation involving the likelihood of cost overruns, defendants argue that the Y element (Penn Ship's knowledge that cost overruns were likely) was publicly disclosed in the Philadelphia Inquirer article from July 20, 1989, which referred to the low bid, and the 1994 DoD IG Report, which stated that "[t]he Penn Ship target costs and price proposals were unreasonably low compared with the other proposals." Atkinson, 255 F. Supp. 2d at 384. Both the article and the DoD IG Report are public disclosures under § 3730 (e)(4)(A). Mistick, 186 F.3d at 383. Penn Ship and Fidelity also argue that the Y element of the second alleged misrepresentation (trust could be defeated by selling assets) was publicly disclosed in the Trust Indenture itself, which was revealed following a 1990 FOIA request. We have made clear that government disclosures following FOIA requests are public disclosures within the meaning of § 3730(e)(4)(A). Mistick, 186 F.3d at 382. Thus, we agree with the District Court that the Y element of the first two instances of alleged fraudulent misrepresentation was publicly disclosed under § 3730(e)(4)(A), thereby precluding Atkinson from being an original source because his knowledge of the components of the first two claims is not direct and independent.

Atkinson claims that the Y element of the third alleged intentional misrepresentation (trust *res* excluded seven acres of shipyard) was not publicly disclosed and, even if it was, he is an original source. The mortgage for the shipyard contained an explicit clause excepting certain land from the mortgage, and the Trust Indenture and accompanying mortgage were disclosed to

43

Schorsch pursuant to a FOIA request. This means that the Y element was publicly disclosed under § 3730(e)(4)(A). Moreover, Atkinson cannot be an original source when he obtained his knowledge from qualifying public disclosures under § 3730(e)(4)(A).[27] Id. Thus, the allegations and transactions of this alleged instance of fraud were publicly disclosed and Atkinson is not an original source.

Therefore, having found that each X and Y element of all three purported instances of intentional misrepresentation was publicly disclosed and that Atkinson is not an original source, we agree with the District Court that there is no jurisdiction to hear this count under §§ 3730(e)(4)(A)-(B).[28]

---

[27]Atkinson argues that his unique knowledge of the Chester Yard makes him an original source. The gist of his argument is that a common citizen would not have known the significance of the excluded property by reading the Trust Indenture. This argument is unpersuasive. In Springfield Terminal, the D.C. Circuit set forth a hypothetical situation in which the critical elements of fraud were publicly disclosed, but in a manner inaccessible to most people, i.e., blueprints. 14 F.3d at 655. That court held that an engineer possessing the knowledge and skill to interpret the blueprints is not granted original source status for that reason alone. Id. Atkinson's ability to "understand" the significance of the excluded acreage is no different than the ability that any skilled surveyor would possess.

[28]Atkinson argues that this count is justiciable as an act in furtherance of the conspiracy alleged in count one. Because we

44

### e. Count Six: Alleged Violation of § 3729(a)(2) by Penn Ship for Knowingly Making a False Misrepresentation that it Would Record Security Interests Under the Trust Indenture

In his sixth count, Atkinson claims that Penn Ship violated 31 U.S.C. § 3729(a)(2) by knowingly making false representations that it would record the security instruments provided in the Trust Indenture. Using the Springfield Terminal formula, the X element is that Penn Ship represented that it would record the Navy's security interests. The Y element is that Penn Ship knew that it was not going to record the interests when it signed the Trust Indenture. The X element was publicly disclosed when the Trust Indenture itself was produced in response to a FOIA request. Stinson, 944 F.2d at 1160. For the same reason, Atkinson is not an original source under § 3730(e)(4)(B) because that public disclosure provided the basis for his knowledge. Id. The District Court held that the Y element was also publicly disclosed[29] but that Atkinson was an

have held that the conspiracy count is not viable, Atkinson's attempt to bootstrap this allegation into that claim is unavailing.

[29]A marked up working copy of the Trust Indenture showed that a provision requiring Fidelity to ensure proper delivery of all documents was struck out. From this, Atkinson inferred that Fidelity convinced the Navy to strike the provision because, had it stayed in the contract, it would have redounded to the Navy's benefit. This marked up version was disclosed during the course

45

original source insofar as the intention not to record can be inferred from the eventual non-recording. Atkinson, 255 F. Supp. 2d at 391-92. As discussed above in connection with Count 1, we disagree with the District Court's conclusion that Atkinson is an original source of the failure to record the security interests. Because Atkinson is not an original source of the Y element, there is no jurisdiction under § 3730(e)(4)(A).[30]

### f. Counts Eight and Nine:[31] Alleged Fraudulent Inducement of the Navy's Exercise of its Options for a Third and Fourth Oiler

In his Second Amended Complaint, Atkinson claims that the Navy's exercise of the contract option to order two additional ships under the Oiler deal was based on Penn Ship's

_____

of a Senate Investigation. The final Trust Indenture was disclosed pursuant to a FOIA request. Both means of disclosure satisfy § 3730(e)(4)(A) and thus require Atkinson to demonstrate original source status before proceeding with the suit.

[30]Atkinson's argument that this count is sustainable on the grounds that it is an action in furtherance of an underlying conspiracy or as part of the alleged Trust Indenture fraud is rendered moot by our decision that the District Court had no jurisdiction over those claims.

[31]Atkinson did not amend his seventh count after it was dismissed from the Second Amended Complaint. Therefore, we will not review it here.

46

false assertion that the BAFO was not a deliberate underbid.[32] Thus, the X element is Penn Ship's assertion that its BAFO was a bona fide bid. The Y element is the fact that Penn Ship knew that the BAFO was unreasonably low and deliberately misstated project costs. We have already established that the BAFO was publicly disclosed within the meaning of § 3730(e)(4)(A) and that Atkinson is not an original source because Schorsch learned of it through the public disclosure. Stinson, 944 F.2d at 1160.

Likewise, we find that the allegations and transactions constituting the Y element were publicly disclosed. The allegation that Penn Ship deliberately understated costs was publicly disclosed by way of the article in the Philadelphia Inquirer and the 1994 DoD IG Report. The allegation that Penn Ship never intended to perfect the security interests described in the Trust Indenture was publicly disclosed when the various versions of the Trust Indenture were produced following FOIA requests.

Nor is Atkinson an original source of either the X or Y elements because his knowledge is based solely upon § 3730(e)(4)(A) public disclosures and information otherwise in the public domain. Stinson, 944 F.2d at 1160. Therefore, there

---

[32]As discussed above, we will not entertain amendments to claims that the District Court did not dismiss from the Second Amended Complaint because Atkinson was not granted leave to amend and did not obtain the consent of the adverse parties. FED R. CIV. P. 15.

is no jurisdiction to hear these claims under § 3730(e)(4)(A).[33]

> **g. Counts Ten and Eleven: Allegations of False and Reverse False Claims Stemming From Misrepresentations Regarding Contract Modifications**

These allegations revolve around alleged implicit representations made by Penn Ship's President, Ronald J. Stevens, during negotiations over Modifications 05 and 11 to the Oiler contract.[34] Atkinson asserts that Stevens impliedly promised that Penn Ship would perform under the Modification terms and that Penn Ship had perfected the Navy's security interests under the Trust Indenture. But, asserts Atkinson, Penn Ship had no intention of performing under the Modifications and had not recorded the security instruments. The intent not to record is gleaned in part from the eventual failure to do so. Atkinson also alleges that had Fidelity either recorded the

---

[33]Atkinson, as he did for count six, argues that these counts are viable as acts in furtherance of the conspiracy in count one. Because there is no jurisdiction over count one, this argument is unavailing. Similarly, these counts cannot survive as aspects of the Trust Indenture fraud alleged in count six because there is no jurisdiction over that claim.

[34]Modification 05 deleted the two option Oilers from the contract and changed Penn Ship's reimbursement regime to a fixed price agreement. Modification 11 provided for an advance payment from the Navy to Penn Ship of up to $17 million to be secured by a floating drydock.

instruments itself or informed the Navy of their non-recordation, the Navy would never have agreed to the Modifications.

The District Court broke down these counts into three separate transactions to facilitate the jurisdictional analysis under Springfield Terminal, and we find this approach helpful.

> (A) Penn Ship's representation that it would perform under Modifications 05 and 11:
>
> > X:  Penn Ship implicitly represents that it will perform.
> >
> > Y:  Penn Ship has no intention of performing as evidenced by the failure to record.
>
> (B) Penn Ship's representation that it had perfected the Navy's security interests under the Trust Indenture:
>
> > X:  Penn Ship implicitly represents that it has perfected the security interests.
> >
> > Y:  Penn Ship does not record the security interests.
>
> (C) Fidelity's breach of its fiduciary duty to the Navy:
>
> > X:  Fidelity promises to serve as fiduciary

49

by agreeing to be trustee.

> Y: Fidelity breaches the duty by convincing the Navy not to insist upon a delivery provision, failing to ensure that the instruments are promptly and properly recorded, and by failing to sign the financing statements.

The X element of transactions A and B can be addressed easily. It is the Modifications themselves that provide the basis for inferring the existence of an implied representation, and these were publicly disclosed within the meaning of § 3730(e)(4)(A). Atkinson contends, however, that the Y element of transactions A and B (failure to record) was not publicly disclosed.

We have already addressed this argument and held, like the District Court, that the non-recordation was publicly disclosed under § 3730(e)(4)(A) in the response to Schorsch's 1993 FOIA request and in the DoD IG Report. As discussed above, we part ways with the District Court on its conclusion that Atkinson is an original source of the non-recordation. We hold that the District Court was without jurisdiction to hear these counts to the extent they rely upon allegations and transactions set forth in transactions A and B.

Turning to transaction C, both the X and Y elements of this transaction were publicly disclosed as well. The X element, Fidelity's promise to serve as fiduciary, was revealed when the Trust Indenture was turned over following a FOIA request. Stinson, 944 F.2d at 1160. We have already established that the

50

components of the Y element (Fidelity's breach of fiduciary duty) were publicly disclosed under § 3730(e)(4)(A) and Atkinson does not appear to contest this assertion. Atkinson is not an original source of the X element because he learned of it from the Trust Indenture which was publicly disclosed for purposes of § 3730(e)(4)(A). Likewise, for the reasons now referred to and relied upon numerous times, Atkinson is not an original source of Fidelity's failure to ensure recordation by mere virtue of the fact that he learned of the non-recordation by examining publicly available county records. Because each element of the C transaction is based upon public disclosures and Atkinson is not an original source, the District Court properly dismissed these counts under Rule 12(b)(1) for lack of subject matter jurisdiction.[35]

### h. Count Twelve:  Alleged Violations of §§ 3729(a)(2) and Based on the Default Modification

The Default Modification stipulated that Penn Ship was in default under the Oiler contract, provided for the transfer of the two original ships to another yard, terminated the Trust Indenture, made Penn Ship liable for certain reprocurement and other costs, and released Penn Ship from any other liability. The Navy received an increased security interest in the floating drydock, another mortgage on some of the land and buildings at

---

[35]Again, although Atkinson argues that these counts survive as acts in furtherance of the conspiracy or Trust Indenture fraud alleged in counts one and six respectively, our prior holdings void these arguments.

51

the Chester Yard, and a preferred mortgage on a large floating derrick. According to Atkinson, these mortgages were designed to secure Penn Ship's obligations to sell collateral to meet its reprocurement obligations. Under the terms of the deal, if Penn Ship was unable to sell within thirteen months, it would no longer be obligated to do so and the Navy's interests in the land would disappear.

Atkinson claims that, by agreeing to the terms of the Default Modification, Penn Ship falsely represented that it intended to fulfill its obligation to attempt to sell the land, buildings, and derrick. To support this claim, Atkinson points to the fact that shortly following the expiration of the thirteen month period, Penn Ship formed MCC, to which it sold the derrick. The essential elements of this count are

> X: Penn Ship asserts that it will use its best efforts to liquidate its interests in the covered property.

> Y: When it made that assertion, Penn Ship had no intention of selling the assets–which is evidenced by its sale of the assets to MCC, a corporate entity created by Penn Ship, after the thirteen month window expired.

First, Atkinson claims that the allegations and transactions that form the basis of this claim were not publicly disclosed when he brought his first FCA claim. For the reasons set forth above, a *qui tam* relator is not saved from the public disclosure bar simply because the information was not publicly

52

disclosed at the time he brought a prior, but now dismissed, *qui tam* action. Atkinson, 255 F. Supp. 2d at 373; Laird, 336 F.3d at 352 n.2. Mistick's "substantially similar to" test forecloses such a reading of § 3730(e)(4)(A). 186 F.3d at 385-88.

Second, Atkinson claims that because the Trust Indenture fraud was not publicly disclosed, and the Navy's agreement to the Default Modification was a consequence of that fraud, count twelve should not be dismissed. We have already stated that we will treat Atkinson's Second Amended Complaint as operative for purposes of the claims not dismissed by the District Court after it ruled on defendants' 12(b)(6) motions. Thus, any attempted reformulation of count twelve is unavailing as an unacceptable modification.[36] FED. R. CIV. P. 15(a). Atkinson argues that the sale of the mortgaged assets to MCC following the thirteen month window indicates Penn Ship's intent not to adhere to the terms of the Default Modification. As so understood, the X element was publicly disclosed in the 1994 DoD IG Report and during hearings before the Senate in 1995. The Y element (sale to MCC and then Donjon) was publicly disclosed in a Coast Guard abstract of title given to Schorsch at his request. This abstract constitutes an "administrative report" under § 3730(e)(4)(A) and, in any event, was an exhibit before the Senate during hearings regarding the propriety of the Oiler

---

[36]In any event, having found no jurisdiction over any of Atkinson's claims, it does not matter which version of count twelve we address. Because we agree with the District Court that any "reformulation" is an impermissible amendment, we will follow the District Court and analyze the count as formulated in the Second Amended Complaint.

53

contract.  See Mistick, 186 F.3d at 383-84 (noting that federal government responses to citizen requests for documents constitute reports under the FCA's jurisdictional provisions).

Having determined that both the X and Y elements were publicly disclosed under § 3730(e)(4)(A), we now turn to whether Atkinson is an original source under § 3730(e)(4)(B). We hold that he is not.  First, Atkinson's former co-relator Schorsch learned of the terms of the Default Modification by way of the DoD IG Report.  Assuming, *arguendo*, that Atkinson can utilize Schorsch's knowledge for purposes of achieving original source status, DoD IG Reports are public disclosures under § 3730(e)(4)(A), and thus Schorsch is not an original source for purposes of § 3730(e)(4)(B).  Stinson, 944 F.2d at 1160.  Schorsch also learned of the sale of the derrick to MCC by way of a qualifying public disclosure under § 3730(e)(4)(A) because Schorsch asked the Coast Guard for an abstract of title that revealed the derrick's ownership history.  Because the Coast Guard's response to Schorsch's request constitutes a public disclosure, Mistick, 186 F.3d at 383-84, Schorsch is not an original source as he derived his knowledge from that document.

Therefore, the District Court correctly dismissed this Count under Rule 12(b)(1) for a lack of subject matter jurisdiction under the FCA.[37]

### i.  Additional Count:  Alleging Violations of §§

---

[37] This count cannot survive as an act in furtherance of a conspiracy or as part of the Trust Indenture fraud because there is no jurisdiction over those claims.

**3729(a)(1) and (2) Based on Biweekly Progress Reports**

We arrive, after a long journey, to relator's final count alleging violation of the FCA.[38]  The gist of this claim is that Penn Ship submitted false or fraudulent progress reports and invoices to the Navy that overstated Penn Ship's costs.  In our now familiar Springfield Terminal algebraic representation:

> X:  Penn Ship submits biweekly invoices to the Navy and represents that it has made expenditures entitling it to reimbursement.

> Y:  Penn Ship had not spent the money for which it sought compensation.

We agree with the District Court that both the X and Y elements of this count were publicly disclosed in the 1994 DoD IG Report, which provides:

> The [DoD Inspector General's] investigation

---

[38]As with a number of previous counts, Atkinson attempted to reformulate this count as a part of the overall Trust Indenture fraud.  Because Atkinson was not granted leave to amend this aspect of his Second Amended Complaint, we consider the version of this claim as written in that pleading.  We reiterate, though, that our holding that there is no jurisdiction over any of Atkinson's claims means that any attempt to link these claims to a prior count is necessarily ineffectual.

55

addressed allegations that Penn Ship progress payment submissions included incurred costs for employee payroll deductions, which Penn Ship did not remit to the appropriate organizations in a timely manner. Penn Ship withheld the deductions beyond the normal 45-day billing cycle before making payment. Penn Ship also withheld payments to vendors while the Navy continued to make progress payments based on incurred costs.

Atkinson, 255 F. Supp. 2d at 402 (quoting DoD IG Report). Atkinson's knowledge of the X and Y elements is not direct and independent within the meaning of § 3730(e)(4)(B) because he admits that his knowledge is based on the information in the DoD IG Report. Therefore, this claim is based upon public disclosures under § 3730(e)(4)(A) and Atkinson is not an original source. Accordingly, dismissal was appropriate under FED. R. CIV. P. 12(b)(1).

## C. Conclusion

We hold that Atkinson's FCA action must be dismissed in its entirety under FED. R. CIV. P. 12(b)(1) for want of jurisdiction. All of the allegations and transactions involved in each of the counts were publicly disclosed under § 3730(e)(4)(A). Moreover, Atkinson is not an original source of any of the allegations or transactions including the defendants' failure to record, and failure to ensure recordation, of the instruments named in the Trust Indenture. We conclude that a plaintiff/relator cannot rely solely on information available in

the public domain to substantiate original source status under § 3730(e)(4)(B). Such a relator does not have direct and independent knowledge of the information that forms the basis of the FCA claim. 31 U.S.C. §§ 3730(e)(4)(A)-(B).

For the above stated reasons, we will affirm the District Court's order of dismissal of all counts, as applicable, of the Second and Third Amended Complaints.

57