Russell S. DUNCAN,
Plaintiff–Appellant,

v.

ROLM MIL–SPEC COMPUTERS and
Loral Corporation,
Defendants–Appellees.

No. 90–1045.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 18, 1990.

Decided Oct. 24, 1990.

Brian H. Herschfus (argued), Wood & Wood, Farmington Hills, Mich., for plaintiff-appellant.

Joseph Ritok, Jr., Steven G. Betz (argued), Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., Margaret A. Murray, Schachter, Kristoff, Ross, Sprauge & Curiale, San Francisco, Cal., for defendants-appellees.

Before: KEITH and MILBURN, Circuit Judges, and THOMAS, Senior District Judge *.

MILBURN, Circuit Judge.

Plaintiff-appellant Russell S. Duncan appeals the district court's award of summary judgment for defendants-appellees Rolm Mil–Spec Computers and Loral Corporation in this *Toussaint* wrongful discharge diversity action. For the following reasons, we affirm.

I.

A.

Russell S. Duncan was hired by Rolm Mil–Spec Computers ("Rolm") in December 1981 as a sales representative. Duncan primarily sold computer systems to government defense contractors, and his territory covered seven Midwestern states, including Michigan, and parts of Canada. Duncan's compensation consisted of a base salary of

---

* Honorable William K. Thomas, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

$33,500 per year, commissions on sales, and special awards. At the time Duncan was hired, he completed and signed an employment application which provided in relevant part:

I understand that nothing contained in this employment application, or in the granting of an interview, is intended to create an employment contract between ROLM Corporation and me. I understand that any employment offered will be an "at-will" relationship, and can be terminated at any time by either party.

J.A. at 135–36.

Each fiscal year Rolm issued a sales commission plan which stated the terms for the determination and payment of commissions for that fiscal year. At the annual sales meeting in August 1986, Duncan read the 1987 commission plan, and he asked his manager, Ralph Petri, about certain changes made in the commission plan. According to Duncan, during their conversation, Petri assured him "that as long as he maintained his sales and met the quota each year, he would *never* be terminated." Appellant's Brief at 10 (emphasis in original). Although Duncan was satisfied with Petri's explanation, he refused to sign the 1987 commission agreement.

In January 1987, approximately four months after the annual sales meeting, Rolm began to experience financial difficulties. Rolm had anticipated bookings in excess of $120 million, but the company only booked $65 million. In early 1987, Rolm laid off more than 250 employees, including approximately one-quarter of its sales force. On January 21, 1987, Duncan was one of six sales representatives who were terminated. Upon termination, Duncan received three months vacation pay, six weeks severance pay, two weeks pay in lieu of notice, and $10,500 in benefits from an employee trust fund. Rolm offered to pay its terminated sales representatives 50 percent of their commission backlog, but Duncan declined the offer.

### B.

Duncan filed this action in the Oakland County Circuit Court on March 17, 1989, against Rolm Mil–Spec Computers and its parent corporation, Loral Corporation (hereinafter collectively referred to as "Rolm"). Rolm removed the action to federal district court on the basis of diversity of citizenship. Duncan's four-count complaint alleges breach of employment contract, misrepresentation and bad faith, intentional infliction of emotional distress, and interference with business relations. Among the damages resulting from his alleged wrongful discharge, Duncan seeks recovery of commissions allegedly withheld by Rolm. Rolm moved for dismissal and/or summary judgment as to all counts of Duncan's complaint.

On December 19, 1989, the district court entered an opinion and order granting Rolm's motion. The district court granted summary judgment on the wrongful discharge claim finding that Duncan was an at-will employee. Alternatively, the district court found that there was just cause for Duncan's discharge as a matter of law based upon Rolm's economically motivated reduction in work force. The district court dismissed Duncan's claim for commissions pursuant to Federal Rule of Civil Procedure 12(b)(1) because Duncan failed to exhaust his administrative remedy of filing a claim with the Michigan Department of Labor. Finally, the district court granted summary judgment as to Duncan's remaining claims because Duncan failed to go beyond the pleadings and make an argument in opposition to Rolm's motion for summary judgment as to these claims. This timely appeal followed.

The principal issues on appeal are (1) whether the district court erred by dismissing Duncan's claim for unpaid commissions for lack of subject matter jurisdiction, and (2) whether the district court erred by granting summary judgment as to Duncan's wrongful discharge claim and his remaining claims.

### II.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.

Civ.P. 56(c). We review a district court's grant of summary judgment *de novo. Pinney Dock and Transp. Co. v. Penn Cent. Corp.,* 838 F.2d 1445, 1472 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). Likewise, dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction presents a question of law subject to *de novo* review. *Moir v. Greater Cleveland Regional Transit Auth.,* 895 F.2d 266, 269 (6th Cir.1990).

## A. *Toussaint* Claim

■ Duncan's wrongful discharge claim is governed by the Michigan Supreme Court's ruling in *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880 (1980), and its progeny. In *Toussaint,* the court held that "an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract." *Id.* at 610, 292 N.W.2d at 890. Duncan argues that his at-will employment status was upgraded to a just cause contract by certain written statements and oral representations made by Rolm.

The written statements relied upon by Duncan are found in Rolm's employee handbook and the 1987 commission plan. The employee handbook states:

> We hope and fully expect that you will be a member of our team for a long time. However, if you decide to leave your employment you should give at least 2 weeks' notice in writing to your supervisor in order to take steps to replace your position and process your termination.

J.A. at 237. The relevant portion of the commission plan states that "it is the intention of this compensation plan to encourage the sales teamwork necessary to maximizing bookings and to grow the business over the longer term." J.A. at 163. Duncan asserts that these written statements created a reasonable expectation that he would be employed by Rolm for a long time.

Duncan next contends that oral representations made by his superiors at Rolm caused him to believe that he would be terminated only if he failed to meet his sales quotas. Although Duncan refers to "representations" made by his "superiors," the only specific example cited by Duncan is the statement made by his manager, Ralph Petri, at the August 1986 annual sales meeting. Duncan testified during his deposition that when he expressed concern about the changes made under the 1987 commission plan, Petri said, "Well, look at it from this standpoint. If you're making your numbers and doing your job, why would they let you go? That's not going to happen." J.A. at 113. Duncan asserts that the oral representations made by his superiors were sufficiently specific to create an issue of fact as to whether he had an implied just cause contract.

Duncan also cites Rolm's "get well" program as evidence that Rolm's actual practice was inconsistent with an at-will employment policy. Duncan asserts that Rolm adopted the "get well" program to assist sales representatives who were unable to meet their sales quotas. The program provided a 90–day period for a sales representative to improve his performance prior to being terminated. Duncan states that prior to his termination only one Rolm sales representative had ever been terminated. Duncan asserts that the sales representative was placed on the "get well" program, and he was eventually fired because he lied about making a booking. Duncan concludes that Rolm's past practice of terminating sales representatives only after placing them on the "get well" program belies the existence of an at-will employment policy.

Our decision in *Reid v. Sears, Roebuck and Co.,* 790 F.2d 453 (6th Cir.1986), provides guidance in resolving this case. In *Reid,* the plaintiffs signed an employment application which included a provision stating that their employment could be terminated with or without cause and that no employee other than the president or a vice-president of the company could make a contrary agreement. 790 F.2d at 456. The plaintiffs relied on portions of the employee handbook to establish the existence of a

just cause contract, but we concluded that "there was no showing that the handbook had been written or approved by the president or a vice-president of Sears." *Id.* at 460–61. We also noted that nothing "in the Sears handbook detracted in any way from the language in the application or provided a reasonable basis for the conclusion that the plaintiffs were employed under a 'for cause' contract." *Id.* at 460. We observed that *"Toussaint* held that employers can avoid misunderstanding over the term of employment by 'requiring *prospective employees* to acknowledge that they serve[ ] at the will or pleasure of the company....' " *Id.* at 462 (emphasis added) (quoting *Toussaint,* 408 Mich. at 612, 292 N.W.2d at 880). We held that by obtaining "an acknowledgement [of at will employment] from each of the plaintiffs when they were prospective employees, Sears had done all that was required to create contracts for employment at will." *Id.*

In the present case, Rolm's employment application required prospective employees to acknowledge that they were entering an at-will employment relationship. Duncan signed the employment application thereby acknowledging his status as an at-will employee. The evidence offered by Duncan does not detract in any way from the at-will language in the application nor does it provide a reasonable basis for concluding that he was employed under a just cause contract.

The written representations relied upon by Duncan do not indicate that he would be terminated for just cause only. The statements in the employee handbook and the commission plan "merely express the 'optimistic hope' of parties to an employment relationship that their future association will be profitable and long-standing." *Pratt v. Brown Mach. Co.,* 855 F.2d 1225, 1234 (6th Cir.1988). Such statements are insufficient to create an implied just cause employment contract.

The oral assurances identified by Duncan also fail to create a legitimate expectation of a just cause contract. In *Vollrath v. Georgia–Pacific Corp.,* 899 F.2d 533, 535 (6th Cir.1990), the employer's policy manual explicitly set forth an at-will policy regarding terminations. We held that the employee's "assertion that the plant manager told him and others on numerous occasions that he would not lose his job if he did his job established at most a subjective expectation of dismissal only for cause." *Id.* In *Pratt,* we held that explicit at-will language in the employee handbook served "to negate the legitimacy of any expectation [the employee] may have had based on [his manager's] representations." 855 F.2d at 1235. In the present case, the oral assurances given by Petri are negated by the express at-will provision in the employment application. Although Petri's representations may have given Duncan a subjective expectation that he would be discharged only for just cause, a "subjective expectation does not create an enforceable contract right." *Sepanske v. Bendix Corp.,* 147 Mich.App. 819, 827, 384 N.W.2d 54, 58 (1985), *appeal denied,* 433 Mich. 914 (1989).

Rolm's "get well" program also fails to support a legitimate expectation that Duncan would be discharged only for just cause. The program is not inconsistent with an at-will employment contract. While the "get well" program may have notified sales representatives that their performance was deficient and provided an opportunity for them to improve, the existence of the program is insufficient to "transform the 'at-will' contract into a contract with a 'just cause' termination provision." *Ford v. Blue Cross & Blue Shield,* 150 Mich.App. 462, 467, 389 N.W.2d 114, 116 (1986).

Duncan's employment contract "clearly included the terms of the application." *Reid,* 790 F.2d at 462. "Though *Toussaint* holds that there may be an implied contract that employment may be terminated only for good cause, it does not hold that this may be the case where an express contract makes the term of employment at will." *Id.* Duncan acknowledged his status as an at-will employee when he signed the employment application, and he has failed to offer any evidence which detracts from the language in the application or provides a reasonable basis for concluding that he would be terminated only for just cause.

Therefore, we conclude that the district court properly granted summary judgment for Rolm on the wrongful discharge claim.[1]

### B. Unpaid Commissions

■ Duncan argues that the district court erred by dismissing his claim for unpaid commissions for failure to exhaust administrative remedies. Duncan focuses on the language of Michigan Compiled Laws, § 408.481(1), and he asserts that he is not required to file an administrative claim prior to commencing litigation. Section 408.481(1) of the Michigan Wages and Fringe Benefits Act provides in relevant part: "An employee who believes that his or her employer has violated this act *may* file a written complaint with the department within 12 months after the alleged violation." (Emphasis added).

Duncan invokes the traditional rules of statutory interpretation and argues that the word "may" as used in section 408.-481(1) should be given its ordinary and accepted meaning as a permissive, rather than mandatory, term. *See Browder v. International Fidelity Ins. Co.*, 413 Mich. 603, 611, 321 N.W.2d 668, 673 (1982); *Newport West Condominium Ass'n v. Veniar*, 134 Mich.App. 1, 12, 350 N.W.2d 818, 822 (1984) (per curiam). Duncan argues that the permissive language in the statute means that he did not have to file an administrative claim for his unpaid commissions prior to commencing this action.

Duncan also attempts to distinguish *Cockels v. International Business Expositions*, 159 Mich.App. 30, 406 N.W.2d 465 (1987), the case relied upon by the district court in dismissing the claim for unpaid commissions. Duncan points out that *Cockels* involved Mich.Comp.Laws § 408.483, a different statute which concerns retaliatory discharge for exercising rights afforded by the Wages and Fringe Benefits Act. Section 408.481(1) provides that a complaint filed pursuant to section 408.483(2) *"shall* be filed within 30 days after the alleged violation occurs." (Em-

phasis added). Duncan notes that the legislature employed the mandatory language "shall" only with regard to a claim under section 408.483(2), and he argues that the permissive language "may" in section 408.-481(1) demonstrates that he was not obligated to file an administrative claim for his commissions prior to bringing this action. Duncan further argues that only when a claim is filed under 408.483(2) is a claimant required to exhaust administrative remedies prior to filing a civil action.

Duncan argues for application of the plain meaning rule, but the Michigan Supreme Court recognizes a corollary to the rule "is that courts should give the ordinary and accepted meaning to the mandatory word 'shall' and the permissive word 'may' *unless to do so would clearly frustrate legislative intent as evidenced by other statutory language or by reading the statute as a whole."* *Browder*, 413 Mich. at 612, 321 N.W.2d at 673 (emphasis added). Similarly, the Michigan Court of Appeals recognizes that "the word 'may' in a statute is construed as permissive rather than mandatory *unless a contrary legislative intent appears."* *Newport*, 134 Mich. App. at 12, 350 N.W.2d at 822. Because other statutory language indicates a contrary legislative intent, we hold that use of the word "may" in section 408.481(1) does not permit a claimant to file a civil action prior to seeking administrative relief.

The preamble to the Wages and Fringe Benefits Act states in relevant part:

AN ACT to regulate the time and manner of payment of wages and fringe benefits to employees; to prescribe rights and responsibilities of employers and employees, and the powers and duties of the department of labor; to require keeping of records; *to provide for settlement of disputes regarding wages and fringe benefits;* to prohibit certain practices by employers; to prescribe penalties and remedies....

(Emphasis added). "As stated in the preamble, one of the purposes of the act is

---

**1.** Because we conclude that Duncan was employed on an at-will basis, it is unnecessary to review the district court's alternative holding

that there was just cause for Duncan's termination.

to prescribe the rights and responsibilities of employers and employees with regard to the time and manner of payment of wages." *Cockels,* 159 Mich.App. at 35, 406 N.W.2d at 467. The act "defines 'wages' as 'all earnings,' including those determined on the basis of commission." *Id.* at 34, 406 N.W.2d at 467. Thus, Duncan's claim for unpaid commissions comes within the ambit of the act.

The preamble also clearly states that one of the purposes of the act is to provide for settlement of disputes regarding wages. The Michigan Court of Appeals has stated, "In order to provide for an expeditious settlement of a dispute regarding wages or fringe benefits the Act also provides that disputes are to be handled, initially, by the Department of Labor." *Carpenter v. School Dist. of City of Flint,* 115 Mich. App. 683, 687, 321 N.W.2d 772, 774 (1982) (citing Mich.Comp.Laws § 408.481). Under Michigan law, the "administrative remedies provided by the Legislature in statutory schemes ... must be pursued before a grievant may seek legal redress in the courts." *Cockels,* 159 Mich.App. at 36, 406 N.W.2d at 468. Thus, Duncan had an administrative remedy for resolving the wage dispute which he was required to exhaust prior to filing this action to recover the commissions.

We reject Duncan's attempt to distinguish *Cockels* by observing that use of the phrase "shall be filed within 30 days" in section 408.481(1) can be read as simply imposing a mandatory 30–day time period within which to file a retaliatory discharge complaint under section 408.483(2). Thus, use of the term "shall" would not require exhaustion of administrative remedies *only* for retaliatory discharge complaints. We believe that this interpretation of the statute is more consistent with the stated purposes of the Wages and Fringe Benefits Act. Accordingly, we hold that the district court properly dismissed Duncan's claim for unpaid commissions for failure to exhaust administrative remedies.

#### C. Remaining Claims

Duncan acknowledges that his remaining claims for misrepresentation, intentional infliction of emotional distress and interference with business relations are contingent upon the wrongful discharge claim being viable. In the district court, Duncan failed to make an argument in opposition to Rolm's motion for summary judgment as to these claims, and on appeal, he has failed to offer evidence or argument to support these claims. Given our disposition of the wrongful discharge claim and Duncan's failure to make any argument regarding these claims, we hold that the district court properly granted summary judgment.

### III.

Accordingly, for the foregoing reasons, the judgment of the district court is AFFIRMED.