RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0120p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA ex rel. DAVID F.
ANTOON and LINDA R. ANTOON,

    *Relators-Appellants*,

  *v.*

CLEVELAND CLINIC FOUNDATION and INTUITIVE
SURGICAL, INC., et al.,

    *Defendants-Appellees*.

No. 13-4348

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:12-cv-00027—Thomas M. Rose, District Judge.

Argued: August 7, 2014

Decided and Filed: June 11, 2015

Before: GIBBONS and McKEAGUE, Circuit Judges; LAWSON, District Judge.[*]

───────────────

## COUNSEL

**ARGUED:** Matthew C. Schultz, BRANNON & ASSOCIATES, Dayton, Ohio, for Appellants. Matthew C. Corcoran, JONES DAY, Columbus, Ohio, for Cleveland Clinic Appellees. Colter L. Paulson, SQUIRE SANDERS (US) LLP, Cincinnati, Ohio, for Appellee Intuitive Surgical. **ON BRIEF:** Matthew C. Schultz, Dwight D. Brannon, BRANNON & ASSOCIATES, Dayton, Ohio, for Appellants. Matthew C. Corcoran, Chad A. Readler, JONES DAY, Columbus, Ohio, Stephen G. Sozio, JONES DAY, Cleveland, Ohio, for Cleveland Clinic Appellees. Colter L. Paulson, Thomas A. Zeno, SQUIRE SANDERS (US) LLP, Cincinnati, Ohio, for Appellee Intuitive Surgical.

───────────────

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

LAWSON, D.J., delivered the opinion of the court in which McKEAGUE, J., joined and GIBBONS, J., joined in part and in the result.  GIBBONS, J. (pp. 19–21), delivered a separate concurring opinion.

―――――――――――

**OPINION**

―――――――――――

DAVID M. LAWSON, District Judge.  When Colonel David Antoon (United States Air Force, retired) learned that he needed prostate surgery, he researched treatment options and specialists, which led him to the Cleveland Clinic and defendant Dr. Jihad Kaouk.  Col. Antoon interviewed Dr. Kaouk and arranged for him to perform the operation, or so he thought.  When Col. Antoon experienced complications following the surgery, his further investigation caused him to suspect that Dr. Kaouk did not actually perform the surgery, and passed off the major duties to a surgical resident.  Based on that suspicion, Col. Antoon lodged complaints with several individuals and agencies, and he filed a medical malpractice action in state court, which was dismissed voluntarily.  Finding no satisfaction, Col. Antoon brought the present lawsuit as a relator under the *qui tam* provisions of the False Claims Act (FCA), premised on the theory that Dr. Kaouk billed the government for work he did not perform, and promoted the robotic surgical device he recommended in violation of the anti-kickback statute.  The United States declined to intervene, and the district court granted the defendants' motion to dismiss, after denying Col. Antoon leave to file a second amended complaint.  Although we do not necessarily agree with some of the district court's grounds for dismissing the case and declining the amendment, we do find that Col. Antoon cannot maintain a false claims action against the defendants because of a jurisdictional bar.  Col. Antoon does not have any direct and independent knowledge of the information upon which his fraud allegations are based; therefore he cannot qualify as an original source of that information, and cannot establish standing as a *qui tam* plaintiff under the FCA.  On that basis, we affirm the judgment of the district court.

## I.  Facts and proceedings

Col. Antoon began this action by filing a *pro se* complaint under seal in the district court on behalf of himself and his wife.  He followed that with an amended complaint.  After the government declined to intervene and the lawsuit was served, the defendants filed a motion to

dismiss under Federal Rule of Civil Procedure 12(b)(1) and (6). Col. Antoon then obtained counsel, who responded to the motion and moved for leave to file a second amended complaint.

## A. First amended complaint

In the first amended complaint, Col. Antoon alleged that he met with Dr. Kaouk on December 6, 2007 to discuss surgical options to treat prostate cancer. At that meeting, Dr. Kaouk informed him that "robotic surgery was the safest surgical option and provided the best surgical outcomes for continence and potency." Moreover, Dr. Kaouk represented that "only he, not doctors in training, would perform [Col. Antoon's] major surgery." Col. Antoon purportedly added language to the informed consent document that only Dr. Kaouk was authorized to perform the plaintiff's surgery.

On January 8, 2008, Col. Antoon underwent surgery, which resulted in multiple permanent complications causing disability and loss of employment. Col. Antoon alleges that he "did not see Jihad Kaouk in the operating room," and told a surgical resident, Dr. Raj Goel that only Dr. Kaouk was authorized to perform his surgery. Dr. Goel called Dr. Kaouk twice from the operating room to express Col. Antoon's concerns and then directed surgery to proceed over Col. Antoon's objections. Dr. Kaouk called Ms. Antoon over the phone to say he "had trouble" and "got stuck," apparently in an effort to explain the lengthy surgery.

On January 15, 2008, Col. Antoon returned to the hospital for post-surgery procedures. A physician's assistant removed Col. Antoon's surgical drain and catheter, but no physician or resident met with him. Col. Antoon alleged that he "began experiencing multiple complications" after the visit, which he communicated to Dr. Kaouk, but were not documented in his chart.

Since July 2009, Col. Antoon alleged that he lodged complaints with the Cleveland Clinic Foundation (CCF), the Ohio Department of Health, the State Medical Board of Ohio, the federal Centers for Medicare/Medicaid Services (CMS), the Joint Commission on Accreditation, and government insurance programs TRICARE and the Civil Health and Medical Program of the Uniformed Services (CHAMPUS). He submitted multiple Freedom of Information Act (FOIA) requests to state and federal agencies. He also filed a medical malpractice action in the

Cuyahoga County, Ohio Court of Common Pleas.  Other former patients of Dr. Kaouk contacted the plaintiff after a newspaper article was published about Col. Antoon's civil complaint.

The CCF ombudsman, Daniel DiCello, investigated Col. Antoon's complaint and concluded that there was "no indication that anything was done outside of the standard of care." The ombudsman confirmed that "Staff Surgeon #16 [Jihad Kaouk] performed all critical points of the surgical procedure, consistent with the information provide[d] to the patient prior to surgery" and "the surgical fellow [Raj Goel] was limited to non-critical points of the surgical procedure, as [is] typically the case with procedures of this type."  But Col. Antoon insisted that CCF's findings were "false and intentionally misleading."  Col. Antoon maintained that many records, documents, and communications were concealed, disappeared, or redacted to conceal complications from the surgery.

The amended complaint states a single claim under the FCA; it appears that Col. Antoon's theory was that CCF and Dr. Kauok violated several provisions of the TRICARE manual when submitting the bill for Col. Antoon's prostate surgery.  The essence of the false claim was the submission of a CMS-1500 claim form for surgery by Dr. Kauok, when in truth the surgery was performed by an unsupervised surgical resident.  The relators also alleged that Dr. Kauok, the CCF, and device manufacturer Intuitive violated the Medicare and Medicaid Patient Protection Act by falsely promoting the efficacy of the robotic surgical device Dr. Kauok recommended when the doctor received compensation from Intuitive.  Presumably, they meant to cite the anti-kickback provision in 42 U.S.C. § 1302a-7b(b)(2).  The relators made similar claims against the other defendants.

B.  Proposed second amended complaint

The proposed second amended complaint, which was rejected by the district court on futility grounds, was considerably more detailed; it spanned 116 pages, contained 569 paragraphs, and included over 700 exhibits.  But the theory of liability was the same: the defendants violated a condition of payment under the TRICARE and CHAMPUS programs when they submitted a CMS-1500 claim form and certified that the surgery was performed personally by Dr. Kaouk.  The condition of payment was found in the TRICARE reimbursement manual.  The plaintiffs alleged that several medical records do not indicate that Dr. Kaouk was

present for the surgery or that the records were altered or signed weeks after the surgery to cover up multiple investigations for fraud. The second amended complaint would have added 26 state law claims as well.

The second amended complaint elaborated on Col. Antoon's experience in the operating room. He says that he met with an anaesthesiologist around noon to discuss the risks and benefits of anesthesia. Thereafter, Dr. Goel, a resident urologist, entered the room and called Dr. Kaouk. Col. Antoon was taken to the operating room shortly before 1:00 p.m. He asked Dr. Goel why Dr. Kaouk was not present. Dr. Goel stated that Kaouk was in another surgery, but would arrive shortly. Goel stated to the anesthesiologist "Let's get going! We are late." Col. Antoon was under anesthesia from 1:05 p.m. until 5:20 p.m; the surgery began at 1:45 p.m. and concluded at 4:47 p.m. Col. Antoon "never saw Kaouk" prior to the anesthesia or in recovery.

Col. Antoon's wife, Linda Antoon, told her husband that Dr. Kaouk "paged her to a telephone to inform her that he had 'trouble' and 'got stuck.'" Dr. Kaouk met with Col. Antoon the next day and informed him that "it took him more time to get the bowel adhesion down, because there was a lot of adhesions, and that he needed the extra 40 minutes to get all the bowel adhesions out of the way." Dr. Kaouk expected a full recovery. However, during a meeting in December 2008, Dr. Kaouk said that Col. Antoon did not have adhesions and that Dr. Kaouk "probably placed clamps on his nerves."

In the proposed second amended complaint, the Antoons alleged that the CMS-1500 claim form Dr. Kaouk submitted contained a legend below Dr. Kaouk's signature stating: "I certify that the statements on the reverse apply to this bill and are made a part thereof." The reverse side of the CMS-1500 form stated:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

The Antoons also elaborated on their conversation with CCF Ombudsman DiCello. They alleged that on July 27, 2009, DiCello called the Antoons and told them that "resident Lee . . . had no recollection of Kaouk being present in Antoon's surgery" and that "customarily, Kaouk

would only be present during the 'nerve sparing portion of the surgery.'" "No findings were discussed other than the assertion by DiCello that Antoon authorized doctors in training to do his surgery and he accepted such risk." Shortly thereafter, Col. Antoon sent DiCello an email asking "[a]t what point in my surgery did Kaouk arrive?" On August 4, 2009, Antoon received a letter from DiCello stating that the internal review was complete and Antoon's medical care was appropriate and within the standard of care for such surgeries.

The Antoons alleged that on October 31, 2009, Dr. Thomas Cook, an orthopedic surgeon, informed Col. Antoon that a surgeon is not allowed to bill for services unless present for the critical procedures. Col. Antoon asked Dr. Cook which portions of a radial prostatectomy are considered critical and Cook responded, "almost the entire surgery."

On November 16, 2009, Dr. Jack Pence, a urologist, reviewed Col. Antoon's surgical records and concluded that Col. Antoon's negative outcome was probably the result of an unsupervised resident doing his surgery. Pence stated that "it was common knowledge that multiple simultaneous surgeries were performed at Cleveland Clinic and other training hospitals by residents with a staff surgeon not present," "he was aware of surgeons at the CCF allowing residents to do surgeries without patient knowledge or consent," and "his last four penile implant procedures were on prostatectomy patients from CCF."

Col. Antoon also clarified that in addition to the complaints he lodged with the several agencies noted earlier, he tendered "41 FOIA submissions to CMS, 38 submissions to DOD/TRICARE, and 7 to HHS." Several of those investigations revealed substantial violations related to medical records, surgical services, and staff credentials. The Antoons also alleged that after they filed their malpractice lawsuit and the *Cleveland Plain Dealer* published its article about the case, the "other victims of Dr. Kaouk" who contacted Col. Antoon said that they never saw Dr. Kaouk during their surgeries.

## C. Proceedings in the district court

After the Antoons filed their lawsuit under seal, and after the United States declined to intervene, the district court ordered service on the defendants and portions of the record unsealed. The defendants filed motions to dismiss under Federal Rules of Civil Procedure 8(a),

9(b), 12(b)(1), and 12(b)(6), arguing that the district court lacked subject matter jurisdiction and the amended complaint failed to state a claim upon which relief could be granted.

In granting the motion to dismiss and refusing leave to file the second amended complaint, the district court held that (1) the amended complaint did not state a claim under the FCA because it did not satisfy Rule 9(b)'s particularity requirement where it did not identify the services that Col. Antoon received, the specific claim form submitted for those services, and the date the claim forms were submitted; (2) the amended complaint did not contain sufficient facts to allege a fraudulent scheme because it did not allege that the defendants submitted any claims that were factually false, *i.e.*, that Dr. Kaouk did not provide any medical services; and (3) the relators did not cite a condition of payment that would be violated if Kaouk was not present during the operation, because the TRICARE reimbursement manual did not constitute a law or regulation, which is what the FCA required.

The district court also held that it lacked subject matter jurisdiction over the FCA allegations against Intuitive, Dr. Kaouk, and the Cleveland defendants because there was public disclosure of the Antoons' allegations before they filed their FCA complaint in federal court, and they could not allege plausibly that they were an original source. The district court observed that facts concerning Dr. Kaouk's financial arrangement and his practice of providing unreasonably optimistic descriptions of surgery outcomes with the robotic device were already in the public domain before the lawsuit was filed. Also, the Antoons made allegations in their June 2010 malpractice lawsuit about Dr. Kaouk's absence from the actual surgery. The court rejected the Antoons' argument that they provided fresh information to the Centers for Medicare/Medicaid Services (CMS), because the amended complaint did not actually say that, and it appeared that the fraud allegations were based on information received *from* CMS. Moreover, the court held, disclosure to CMS does not satisfy the FCA's requirement of disclosing information to the government; disclosure must be made to the Department of Justice (DOJ), and there were no factual allegations in the amended complaint or proposed second amended complaint that the Antoons made a disclosure to the DOJ.

Finally, the court held that the amended complaint did not state a claim for a violation of the anti-kickback statute because the parts of that statute cited in the amended complaint are

criminal provisions and may only be enforced by the government; and even if the Antoons could bring the claim, the factual allegations were insufficient to state a claim. The court also denied leave to amend because the proposed second amended complaint did not cure the defects in the FCA claims, and the court would have declined to exercise supplemental jurisdiction over the remaining state-law claims.

## II. Discussion

Although we do not necessarily agree with some of the district court's rulings based on Rule 12(b)(6), the success of this case for the Antoons boils down to the question of subject matter jurisdiction, which was addressed by the defendants' motion under Rule 12(b)(1). We give fresh review to a district court's dismissal of an FCA complaint for lack of subject matter jurisdiction. *Russell v. Garrard*, 83 F. App'x 781, 782 (6th Cir. 2003) (per curiam) (citing *Duncan v. Rolm Mil-Spec Computers*, 917 F.2d 261, 263 (6th Cir. 1990)).

Some of the defendants' challenges address the substance of the fraud allegations and attack the merits of the relators' claims. We have warned that attacks on the merits should not be confounded with jurisdictional challenges, admonishing courts to be more exacting when addressing arguments styled as jurisdictional attacks. *Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515, 518-19 (6th Cir. 2006) ("'Clarity would be facilitated . . . if courts and litigants used the label "jurisdictional" not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.'" (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam), and citing *Kontrick v. Ryan*, 540 U.S. 443, 453 (2004))).

However, although it is obvious that Col. Antoon's main grievance stems from his belief that he received poor medical care, or perhaps that he was deprived of the benefit of his bargain (he hired the seasoned pro but believes he got the untested rookie instead), the actual victim of the federal claim he seeks to advance is the United States. Under the FCA, it is illegal to present a false claim for payment to the *government*. 31 U.S.C. § 3729(a)(1). The *qui tam* provisions of the Act grant standing to a limited class of private individuals to bring such claims. *See United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990) ("'[T]he purpose of the *qui tam* provisions of the False Claims Act is to encourage private individuals who are

aware of fraud being perpetrated against the Government to bring such information forward.'") (quoting H.R.Rep. No. 99-660, at 22 (1986)); *see also United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 912 (4th Cir. 2013) (noting that the *qui tam* provisions of the FCA "statutorily vests private citizens with standing" (citing *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000))).   To establish standing, Col. Antoon must plead facts in his complaint that demonstrate that he satisfies the FCA's *qui tam* requirements. *See United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 515-16 (6th Cir. 2009) (reiterating that "for a *qui tam* relator to  have standing to bring her claim, she 'must be a true "whistleblower"'" (quoting *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1035 (6th Cir.1994))).   If he cannot meet those requirements, then he does not have standing and the federal courts do not have subject matter jurisdiction over his FCA claim. *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007) ("As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing standing.   If Plaintiffs cannot establish constitutional standing, their claims must be dismissed for lack of subject matter jurisdiction.") (internal citations omitted); *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 534 (6th Cir. 2002) (Gilman, J., concurring) ("Without Article III standing, the district court lacked subject matter jurisdiction over the entire case. Where jurisdiction does not exist, 'the only function remaining to the court is that of announcing the fact and dismissing the cause.'"); *Ward v. Alternative Health Delivery Sys., Inc.*, 261 F.3d 624, 626 (6th Cir. 2001) ("Standing is thought of as a 'jurisdictional' matter, and a plaintiff's lack of standing is said to deprive a court of jurisdiction.") (citations omitted).

One of those requirements is that when the basis of the lawsuit has been publically disclosed in advance, the person filing the action must be the original source of the information that a false claim has been presented.  *Poteet*, 552 F.3d 503, 507 (6th Cir. 2009) (stating that there is no "federal jurisdiction" under the "FCA [for] actions 'based on the public disclosure of allegations or transactions . . . unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.'" (quoting 31 U.S.C. § 3730(e)(4)(A) (2005)).  After a public disclosure of the basis of the lawsuit, if a *qui tam* relator cannot establish himself as an original source of the information, he has no standing to proceed with the action.

The "original source" requirement in effect when the claim arose is jurisdictional. *Rockwell Intern. Corp. v. United States*, 549 U.S. 457, 467-68 (2007).

## A.  2010 amendments to the FCA

Before we address the CCF defendants' public disclosure bar arguments, we must determine which version of the statute applies to this case.  The events described in the complaint occurred in 2007 and 2008.  Congress amended the FCA in March 2010 and modified several aspects of the public disclosure bar, including the definition of "original source" in section 3730(e)(4)(B).  There is no indication that the statute was meant to have retroactive effect, which would be necessary to apply it to conduct that occurred before the amendment. *See Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946 (1997) (holding that the presumption against retroactivity must apply "unless Congress has clearly manifested its intent to the contrary"); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (observing that "the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal" (internal quotation marks omitted)).  The Supreme Court has held on two occasions that the 2010 FCA amendments do not apply to cases arising before the effective date of the statute. *Schindler Elevator Corp. v. United States ex rel. Kirk*, --- U.S. ---, 131 S.Ct. 1885, 1889 n.1 (2011); *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010) ("The legislation makes no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed defense to a qui tam suit.").  Other circuit courts that have considered the question have applied the pre-2010 version of the statute to such cases. *See May*, 737 F.3d at 918; *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 232 n.3 (3d Cir. 2013); *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 934 (7th Cir. 2012); *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 n.6 (5th Cir. 2011); *United States ex rel. Poteet v. Bahler Med., Inc.*, 619 F.3d 104, 107 n.2 (1st Cir. 2010); *United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1188 n.3 (8th Cir. 2010).  In *May*, the Fourth Circuit thoroughly analyzed the changes to section 3730(e)(4) wrought by the 2010 amendments and concluded that "the 2010 version of the public-disclosure bar cannot be applied in [that] case, notwithstanding the fact that the complaint was

filed after the effective date of the amendments." *May*, 737 F.3d at 918 (citation omitted). We agree and hold that the pre-2010 version of section 3730(e)(4) applies in this case.

## B. Original source

A relator cannot establish *qui tam* status if the "action under . . . section [3730 is] based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media" unless the relator "is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (1986). Congress has defined an "original source" as

> an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(B) (1986). The district court held that the relators did not qualify as an original source because they did not disclose their information to a Department of Justice official. On appeal, the CCF defendants also argue that the relators did not have personal knowledge of the fraudulent conduct. The relators challenge both conclusions on appeal, as well as the conclusion that a public disclosure occurred.

## 1. Public disclosure

A public disclosure occurs "when enough information exists in the public domain to expose the fraudulent transaction.'" *United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 331 (6th Cir. 1998) (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)). There is enough information in the public domain if "'the information is sufficient to put the government on notice of the likelihood of related fraudulent activity.'" *Poteet*, 552 F.3d at 512 (quoting *United States ex rel. Gilligan v. Medtronic, Inc.,* 403 F.3d 386, 389 (6th Cir. 2005)). Public disclosure "includes documents that have been filed with a court, such as discovery documents and a plaintiff's complaint," *ibid.*, even if the plaintiffs filed the documents themselves, *United States ex rel. Jones v. Horizon Healthcare Corp.,* 160 F.3d 326, 333 (6th Cir. 1998). Public disclosure also includes responses to FOIA requests. *Schindler Elevator*, 131 S. Ct. at 1893.

Two types of disclosures are sufficient to put the government on notice of fraud. *Poteet*, 552 F.3d at 512. First, "'if the information about both a false state of facts and the true state of facts has been disclosed, we [will] find that there has been an adequate public disclosure because fraud is implied.'" *Ibid.* (quoting *Gilligan*, 403 F.3d at 389). Second, "if there has been a direct allegation of fraud, we will find a public disclosure because such an allegation, regardless of its specificity, is sufficient to put the government on notice of the potential existence of fraud." *Ibid.* (citing *Gilligan*, 403 F.3d at 389). "Moreover, the information suggesting fraud need not even come from the same source as long as the different sources 'together provide information that leads to a conclusion of fraud.'" *Ibid.* (quoting *Gilligan*, 403 F.3d at 390).

Several aspects of the relators' pleadings show that there was a prior public disclosure of fraud. *First*, the Antoons filed a state court complaint on June 6, 2010, nearly two years before they filed their federal court action, in which they alleged that "upon information and belief, Dr. Kaouk either was not present during Colonel Antoon's surgery, or he merely observed while key aspects of the procedure were completed by Dr. Goel, Dr. Lee, or some other doctor-in-training." *Second*, the Cleveland Plain Dealer published an article highlighting the Antoons' allegations and referenced the CMS investigation that, among other things, reviewed whether Dr. Kaouk performed his surgery. *Third*, the amended complaint and proposed second amended complaint contain allegations that the Antoons learned from responses to FOIA requests. Not only are those allegations sufficient to put the government on notice of the likelihood of "related fraudulent activity," *Poteet*, 552 F.3d 503 at 516, but the government (CMS) investigated whether Dr. Kaouk performed the surgery and concluded he had.

Further, the relators' *qui tam* complaint was "based upon" a prior disclosure of fraud because there was "'a substantial identity . . . between the publicly disclosed allegations or transactions and the *qui tam* complaint.'" *Id.* at 514 (quoting *Jones*, 160 F.3d at 332). For instance, the state court complaint, noted above, accused Dr. Kaouk of being absent from or not personally performing the core surgical tasks. And at least some of the allegations in the federal pleadings about Dr. Kaouk's surgery schedule and inaccuracies contained in Dr. Kaouk's medical records are based on responses that the Antoons received from their FOIA requests.

Because there was a public disclosure, the Antoons cannot establish *qui tam* status unless they are an "original source."

## 2. Disclosure to the "Government"

The district court held that the Antoons cannot be an original source because they did not disclose their information about the defendants' fraud to a Department of Justice official. A relator must disclose evidence of fraud to the *government* before filing an action under the FCA. *Jones*, 160 F.3d at 334. "[T]his rule is necessary because one is not a true whistleblower unless she is responsible for alerting the government to the alleged fraud before such information is in the public domain." *Ibid.* However, we have never held that disclosure to the government under 31 U.S.C. § 3730(e)(4)(A) is limited to the Department of Justice. Instead, a relator satisfies the requirements of 31 U.S.C. § 3730(e)(4)(A) if he discloses the information to the *federal* government. *Jones*, 160 F.3d at 334-335; *see also United States ex rel. Davis v. District of Columbia*, 679 F.3d 832 (D.C. Cir. 2012) (disclosure to Inspector General of Dept. of Health and Human Services held to be sufficient disclosure to "the government"); *Minn. Assoc. of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1032 (8th Cir. 2002) (holding that an association of nurse anesthetists qualified as an original source because it voluntarily provided information to the local Medicare office before filing suit). The district court erred in concluding that the Antoons did not qualify as an original source because they directed their complaints to CMS rather than the Department of Justice.

## 3. Direct and independent knowledge

An original source is "an individual: (1) with direct and independent knowledge of the information on which the allegations are based . . . ." *Jones*, 160 F.3d at 333 (citing 31 U.S.C. § 3730(e)(4)(B) (1986)). Our cases have addressed the meaning of "direct and independent knowledge" only in passing. We first discussed what it takes to be an "original source" in *United States ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 941 (6th Cir. 1997), where we assessed the competing interpretations of that term among the circuits. We adopted the D.C. Circuit's approach in *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997), *overruled on other grounds by United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 838-39 (D.C. Cir. 2012), and held that a relator is an

original source if the relator informs the government of the allegations of fraud before those allegations are disclosed to the public. *Id.* at 942 (finding "difficult[y] . . . understand[ing] how one can be a 'true whistleblower' unless she is responsible for alerting the government to the alleged fraud before such information is in the public domain"). However, a relator is not required to have had a hand in the public disclosure of the allegations that make up the *qui tam* lawsuit. *Ibid.*

In arriving at that conclusion, we observed that the meaning of "direct knowledge" is commonly "interpreted as 'marked by absence of intervening agency,'" *Id.* at 941 (quoting *United States ex rel. Stinson v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991)); and "'independent knowledge' is not 'dependant on public disclosure,'" *ibid.* (quoting *Houck v. Folding Carton Admin. Comm.*, 881 F.2d 494, 505 (7th Cir. 1989)). We noted that the *Findley* court defined "direct knowledge" to mean first-hand knowledge and "independent" to mean that the information known by the relator does not depend or rely upon the public disclosures, *id.* at 942, although we had no occasion to adopt those definitions at the time.

However, that definitional question presents itself here, because much of the information of the fraud alleged by the Antoons was pieced together from their interpretation of the records they gathered and their suspicion generated by what Col. Antoon saw — or did not see — immediately before and after his surgery. The CCF defendants argue that a relator cannot have "direct knowledge" under section 3730(e)(4)(B) unless his knowledge is first-hand.

There is language in the opinions from some courts that supports that idea. In *United States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516 (9th Cir. 1998), for instance, the court held that the relator, a physician, was not an original source of alleged Medicare billing fraud because the information "stem[med] from suspicions he developed after talking with patients who had previously received medical services from [the defendants] and after reviewing the information contained in their medical records." *Id.* at 523. The court looked to its own precedent, *United States ex rel. Devlin v. State of California*, 84 F.3d 358, 360 (9th Cir. 1996), in which it had held that the relator was not an original source of the alleged fraud because he learned of it from an insider who actually witnessed the record falsification, and told the relator about it. In both cases, the court contrasted the facts in *Wang v. FMC Corp.*, 975 F.2d 1412 (9th

Cir. 1992), in which an engineer-relator was found to be an original source because, when he was called in to study a problem with a product sold to the government because "he saw [it] with his own eyes" and his knowledge was "unmediated by anything but [his] own labor." *Id.* at 1417. The court then concluded that second-hand information does not constitute "direct knowledge"; to be an original source, the relator "must show that he had firsthand knowledge of the alleged fraud, and that he obtained this knowledge through his 'own labor unmediated by anything else.'" *Aflatooni*, 163 F.3d at 525 (quoting *Devlin*, 84 F.3d at 361).

However, there is nothing in the statutory text that limits "direct knowledge" to first-hand knowledge. And "we have never stated whether a relator must possess a certain nature and quantity of information in order to have 'direct and independent knowledge' of her allegations." *United States ex rel. Branhan v. Mercy Health Sys. of Sw. Ohio*, 188 F.3d 510 (6th Cir. 1999) (table) (Clay, J., concurring in part and dissenting in part). "Congress did not prescribe by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the *qui tam* relator for suits to proceed." *Springfield,* 14 F.3d at 653.

Certainly, proof of first-hand knowledge of fraud is *sufficient* to establish direct knowledge. After all, "[t]he paradigmatic 'original source' is a whistleblowing insider" who is a "'close observer[] or otherwise involved in the fraudulent activity.'" *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1154, 1161 (3d Cir. 1991) (quoting S. Rep. No. 345, at 4, reprinted in U.S. Code Cong. & Admin. News 5269). But first-hand knowledge is not a *necessary* component of direct knowledge. A relator may rely in part on research or on information already in the public domain. *See Minn. Ass'n of Nurse Anesthetists*, 276 F.3d at 1050 ("If the relator has direct knowledge of the true state of the facts, it can be an original source even though its knowledge of the misrepresentation is not first-hand."); *United Stated ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 522-23 (3d Cir. 2007) ("We decline to adopt a rigid rule that consultation with public documents automatically disqualifies a relator from being an original source. Some reliance on public records or information is acceptable and, indeed, it is hard to imagine that a non-insider could ever obtain original source status without at least some consultation of publicly available information.") (citing *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1053 (10th Cir. 2004)).

For instance, a relator may have direct (but not first-hand) knowledge of the billing practices of an institution, and uncover fraud only after consulting a public document that reveals that those practices are fraudulent. *See Minn. Ass'n of Nurse Anesthetists*, 276 F.3d at 1050. We believe, therefore, the better view is that "direct" knowledge is knowledge gained by the relator's own efforts and not acquired from the labor of other people. *See United States ex rel Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 799 (10th Cir. 2002); *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 177 (5th Cir. 2004). The statute requires the relator to possess direct knowledge of the "information" upon which the fraud allegation is based. "On the basis of plain meaning . . . § 3730(e)(4)(B) does not require that the *qui tam* relator possess direct and independent knowledge of *all* of the vital ingredients to a fraudulent transaction." *Springfield*, 14 F.3d at 656-57; *see also Reagan*, 384 F.3d at 177 ("The plain meaning of the term 'direct' requires 'knowledge derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others.'"); *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1044-45 (10th Cir. 2004) ("Our review of the relevant case law revealed no requirement that a relator be a corporate insider. Additionally, we can think of no valid reason for creating such a restriction.").

Each case is different and must be analyzed to assess the degree of the relator's original input into the facts disclosed to the government. As the court explained in *Kennard v. Comstock Resources, Inc.*, 363 F.3d 1039 (10th Cir. 2004),

> A mere compilation of documents or reports already in the public domain will not allow a relator to qualify as an original source. However, a complete and thorough investigation of a fraud on the Government will likely necessarily involve some review of contracts, documents, or other information in the public domain. It is the character of the relator's discovery and investigation that controls this inquiry.

*Id.* at 1045; *see also Atkinson*, 473 F.3d at 522 (noting that "[t]he more obscure the records and the more significant the investigative input of the relator, the more likely it is that granting original source status will fulfill the FCA's 'twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own'" (quoting *Springfield*, 14 F.3d at 651)).

Applying these principles requires us to focus on the character of the information of which Col. Antoon had direct knowledge. He knew that Dr. Kaouk was not present in the operating room before his surgery or after he woke up in the recovery room, but he did not personally observe whether Dr. Kaouk performed his surgery. Nor did Col. Antoon personally observe Dr. Kaouk create fraudulent medical records or bill TRICARE for other surgeries that he alleges Dr. Kaouk did not perform himself. Col. Antoon contends that the allegations that CCF and Dr. Kaouk violated conditions of payment are based on his own observations and a review of his private medical records. He received a copy of those records on February 11, 2009, March 11, 2010, and March 17, 2010 — in the case of some documents, years before he received any FOIA responses. The heart of the Antoons' FCA claim appear to be based on his review of those records — which led him to believe that Dr. Kaouk did not perform his surgery — and the fact that Col. Antoon did not see Dr. Kaouk before or after he performed his surgery.

However, that information is not sufficient to constitute direct and independent knowledge within the meaning of 31 U.S.C. § 3730(e)(4)(B), because the conclusion that Dr. Kaouk was not personally involved in the surgery is largely speculative. "[T]he purposes of the Act would not be served by allowing a relator to maintain a qui tam suit based on pure speculation or conjecture." *Aflatooni*, 163 F.3d at 526. "[M]ere suspicion that there must be a false or fraudulent claim lurking around somewhere simply does not carry [a relator's] burden of proving that he is entitled to original source status." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 353 (4th Cir. 2009). Although the Antoons suspect that CCF and Dr. Kaouk committed fraud, they do not have any direct and independent knowledge of the information upon which their allegations are based. Col. Antoon does not have any direct or independent knowledge of any of the essential elements of an FCA claim. He did not see whether Dr. Kaouk performed his surgery, did not observe Dr. Kaouk submit false claims, and has only suspicion that his medical records were altered. Moreover, although the Antoons "may have provided the initial impetus" for the CMS investigation, that fact does not support a conclusion that the Antoons qualify as an original source. *Hafter*, 190 F.3d at 1162. Although Col. Antoon *suspects* that Dr. Kaouk submitted a false claim, mere suspicion is insufficient to qualify Col. Antoon as an original source.

Because Col. Antoon is not an original source of the information on which his complaint was based, the public disclosure bar deprived the district court of subject matter jurisdiction over this action. Dismissal of the amended complaint, therefore, was proper. And because the proposed amended complaint did not cure those defects, refusal to allow the amendment on futility grounds was proper.

### III.

For the reasons discussed above, the district court's judgment of dismissal is **AFFIRMED**.

---

**CONCURRENCE**

---

JULIA SMITH GIBBONS, Circuit Judge, concurring.  I agree with the result reached by the majority, but I differ in my analysis of the meaning of "direct and independent knowledge." 31 U.S.C. § 3730(e)(4)(B).  The majority is correct that the records and experts relied upon by the Antoons could not support their knowledge of the fraud they alleged.  Even assuming that the Antoons could rely completely on second-hand knowledge, the Antoons had at most, as the majority notes, a set of facts and inferences that gave them a "'mere suspicion,'" Maj. Op. at 23 (quoting *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 353 (4th Cir. 2009)), that fraud had occurred.  But the Antoons' complete reliance on "'speculation or conjecture,'" *id.* (quoting *United States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 526 (9th Cir. 1998)), means that we need not fully answer the question of what sort of knowledge is "direct and independent" under § 3730(e)(4)(B).[1]

But since the majority addresses that question, I believe the better approach would hew more closely to that of the *Findley* court.  In other words, "to be 'direct,' the information must be first-hand knowledge." *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 690 (D.C. Cir. 1997), *abrogated on other grounds as recognized by United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 837–39 (D.C. Cir. 2012).  Certainly, a relator need not have first-hand knowledge of *all* of the information supporting his allegations, *see United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 656–57 (D.C. Cir. 1994), but he must have at least *some* first-hand knowledge of that information.  *See United States ex rel. Branhan v. Mercy Health Sys. of Sw. Ohio*, 188 F.3d 510 (6th Cir. 1999) (unpublished table decision) (citing *United States ex rel. McKenzie v. BellSouth Telecomms., Inc.*, 123 F.3d 935, 943 (6th Cir. 1997), to hold that relator cannot be an original source without first-hand knowledge).  As the Third Circuit has explained, "[s]ome reliance on public records or information is acceptable . . . . [but] courts must be mindful of suits based *only* on secondhand information, speculation, background information or collateral research." *United States ex rel. Atkinson v.*

---

[1]This is especially true since the class of claims governed by that language is finite and shrinking, *see* 31 U.S.C. § 3731(b), after the 2010 amendments to the original source definition.

*PA. Shipbuilding Co.*, 473 F.3d 506, 522–23 (3d Cir. 2007) (emphasis added) (internal quotation marks omitted). The relator may have personal knowledge of the defendant's business practices, for instance, but not of its representations to the federal government. *See Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1050 (8th Cir. 2002).

A personal knowledge requirement seems to me a closer reading of the cases from our sister circuits. In fact, this is quite possibly what the *Aflatooni* and *Vuyyuru* courts meant when they dismissed the claims before them as founded on suspicion and conjecture. *See Vuyyuru*, 555 F.3d at 352–53 (citing *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474–75 (2007)) (holding that a doctor-relator could not establish direct knowledge of a hospital's fraudulent billing after he "had withdrawn from practicing" there at the time of the alleged fraud); *Aflatooni*, 163 F.3d at 525 (equating direct knowledge with first-hand knowledge). When courts have defined "direct" as, say, "marked by the absence of intervening agency," they have often applied this phrase to require some amount of first-hand knowledge. *See, e.g., United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160–61 (3d Cir. 1991) (finding no direct knowledge where relator acquired information "through two intermediaries"); *accord United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162–63 (10th Cir. 1999); *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995); *see also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 178–79 (5th Cir. 2004) ("[B]y [relator's] own admission, the knowledge that she brings to the case is almost entirely indirect—that is, based on research and review of public records, not . . . her own observation."). This conclusion also comports with the "theme recurring through the legislative history [of the 1986 amendments] . . . to encourage persons with first-hand knowledge of fraudulent misconduct to report fraud. Congress sought to stop the 'conspiracy of silence' among employees of corporations engaging in fraud." *Prudential Ins. Co.*, 944 F.2d at 1154 (quoting S. Rep. No. 99-345, at 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5269); *cf. Rockwell Int'l Corp.*, 549 U.S. at 475 ("*Because Stone was no longer employed by Rockwell at the time*, he did not know that the pondcrete was insolid . . . ." (emphasis added)).

In addition to aligning more closely with case law, a rule of some first-hand knowledge comports with the normal meaning of "direct" as applied to evidence. Direct evidence is testimony of a witness about what that witness personally saw or heard or did. Sixth Circuit Pattern Jury Instructions § 1.06(2) (West 2013); *see also* 1 Clifford S. Fishman & Anne T. McKenna, *Jones on Evidence* § 1:5 (7th ed. 2014). In other words, direct evidence is based on first-hand knowledge. The knowledge possessed by the Antoons is based on their investigation of records created and maintained by others, and this is not first-hand. To the extent they have first-hand knowledge, it does not extend to having witnessed Kaouk's presence or absence during surgery or to the filing of any claims with the government. Because the Antoons do not qualify as an original source, I agree that their complaint must be dismissed.